STATE OF CONNECTICUT *v.* PEDRO ORTIZ
(10585)

DUPONT, C. J., O'CONNELL and FREEDMAN, Js.

Argued November 2, 1992—decision released January 5, 1993

*James M. Chase,* deputy assistant public defender, for the appellant (defendant).

*Marjorie Allen Dauster,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Mary Reidy,* assistant state's attorney, for the appellee (state).

FREEDMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of two counts of the crime of misconduct with a motor vehicle in violation of General Statutes § 53a-57.[1] On appeal, the defendant claims that the trial court improperly (1) denied his motion for judgment of acquittal and (2) instructed the jury on the issue of causation. We affirm the judgment of the trial court.

The following evidence was adduced at the defendant's trial. On May 26, 1990, at approximately 3:30 p.m., the defendant was operating his 1983 Ford Escort in a southerly direction on Prospect Street in New Haven, traveling uphill toward the intersection of Prospect and Trumbull Streets. At the same time, a motorcycle operated by Charles Wicker and bearing his six year old son, Germaine, approached the intersection from the opposite direction. As the defendant was turning left onto Trumbull Street, the motorcycle struck

---

[1] General Statutes § 53a-57 (a) provides: "A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person."

the passenger side of the defendant's vehicle. Both Charles and Germaine Wicker died as a result of the collision.[2]

The intersection of Prospect and Trumbull Streets presents an obstructed view. The degree of obstruction depends on how close one is to the top of the incline leading to the intersection and how high off the ground one is. Vision is obstructed as to objects on the opposite incline until one is near the top of the incline.

The speed limit on Prospect Street at the time of the accident was twenty-five miles per hour. Eyewitnesses agreed that the motorcycle was traveling far in excess of the legal limit. Gilberto Muniz, a rear seat passenger in the defendant's vehicle, testified that when he saw the motorcycle approaching, it was traveling at seventy-five or eighty miles per hour. Richard Ingber, a medical student who was south of the intersection immediately before the accident, estimated that the motorcycle was traveling at fifty miles per hour. Michael Schoen, who also was south of the intersection immediately before the accident, estimated the speed of the motorcycle at fifty to sixty miles per hour. A defense accident reconstruction expert estimated that the speed of the motorcycle at the time of impact was between fifty-three and seventy-four miles per hour.

At the time of the accident, Charles Wicker did not have a special motorcycle endorsement on his driver's license, which is required to operate a motorcycle. In addition, his driver's license had been suspended one week before due to his failure to appear in court on a motor vehicle violation. Furthermore, according to certain eyewitnesses, the child was seated on the gas tank of the motorcycle in front of the driver. Placing a child

---

[2] During the trial, defense counsel stipulated that "the cause of death was trauma due to a motorcycle or a motor vehicle accident."

on a motorcycle in front of the operator is both illegal and dangerous because it can interfere with the ability of the operator to control the motorcycle.

At the scene of the accident, the defendant stated that he did not see the motorcycle coming. Muniz testified that the defendant was not speeding or weaving while operating the car. He further stated that the defendant slowed to make the left turn under a green light, and that Muniz first saw the motorcycle when it was four to six feet away from the car. Ingber testified that at about one second before the motorcycle arrived at the midpoint of the intersection, the defendant's car began to make the left hand turn. Schoen observed the car enter the intersection at normal speed while the light was green and start making the turn. As the light changed from green to yellow, Schoen observed the motorcycle hit the car.

Several witnesses testified to their observations of the defendant's behavior at the scene of the accident. Larry Ghirardi, a New Haven paramedic and part-time constable in Old Lyme, was dispatched to the scene. Muniz pointed out the defendant to Ghirardi as the driver of the automobile, and Ghirardi approached him to determine whether he needed medical attention. Ghirardi observed that the defendant's eyes were bloodshot and glassy, and that he smelled of alcohol. The defendant would not look directly at Ghirardi when Ghirardi was speaking to him, but stared with a fixed gaze beyond Ghirardi's shoulder. The defendant was not standing erect, and rocked back and forth in a swaying motion. Ghirardi believed that the defendant was under the influence of alcohol. Ghirardi did not believe that the defendant was in need of medical attention or that he was in shock. Ingber approached the defendant to determine if he needed assistance. The defendant appeared stable and was able to respond to

questions, but appeared dazed and was staggering. Ingber did not attribute this condition to any particular cause. Alyson Blake, a nurse who witnessed the collision, talked to the defendant after ambulance personnel arrived and relieved her of responsibility for the injured child. She believed that because the defendant was very upset, nervous and anxious he was in a state of shock, but not medical shock. She was not very close to the defendant and did not notice an odor of alcohol. It did not occur to Blake that the defendant was under the influence of alcohol.

Juan Mulero, an investigating officer who responded to the accident, testified that after the defendant stepped forward to identify himself to Mulero as the driver of the car, Mulero noted that the defendant's hair and clothing were disheveled, he was unshaven, and his eyes bloodshot. Mulero had to ask the defendant several times for his license, registration and insurance card before the defendant responded. The defendant looked at the officer with a dazed stare. Mulero detected an odor of alcohol on the defendant's breath. When the two went to the defendant's car to retrieve the documents, the defendant walked very slowly. The officer stated that it was not a normal pace. At the vehicle, the officer noted an open beer bottle on the front console, and empty beer containers in the backseat.

Thereafter, Officer Vincent Vescovi, Jr., was called to the scene to administer field sobriety tests to the defendant. On his arrival, Vescovi observed that the defendant's pants were falling down and his eyes were bloodshot and glassy. The defendant looked around as if he was not paying attention to what Vescovi was saying. Vescovi informed the defendant that he was going to conduct field sobriety tests, and the defendant

responded that that was fine and that all he had had was two or three beers. The defendant's speech was slurred, and his breath smelled of alcohol.

Vescovi administered the field sobriety tests with the assistance of Mulero, who repeated the instructions to the defendant in Spanish. The defendant had difficulty following the instructions. He had difficulty maintaining his balance during the one leg stand test and the heel-to-toe walk test. He could not walk touching heel to toe or in a straight line. The defendant exhibited jerkiness during the horizontal gaze nystagmus test. Mulero and Vescovi concluded that the defendant failed the field sobriety tests and was under the influence of alcohol, and placed him under arrest.

The defendant consented to a blood test, again stating that he had had only two or three beers. The defendant was taken to Yale-New Haven Hospital, where two blood samples were drawn at a twenty-five minute interval.

Sanders Hawkins, chief toxicologist for the state, testified that the defendant's blood was analyzed at the state forensic lab and that the first sample had a blood alcohol content of 0.19 and that the second sample had a blood alcohol content of 0.18. Extrapolating back to the time of the collision, Hawkins estimated that the defendant's blood alcohol content would have been between 0.19 and 0.24. To achieve this blood alcohol level, Hawkins estimated that the defendant had to have consumed between nine and twelve bottles of beer. Hawkins stated that the defendant could not have achieved that level of blood alcohol after consuming only two or three beers. Furthermore, Hawkins testified that with a blood alcohol level of between 0.19 and 0.24, the average person would be considerably intoxicated, would not be able to think clearly, would probably slur his speech and stagger, and would have

impaired eye-hand coordination and motor skills. Hawkins also testified that such a person's reaction time would be slowed; he might not be able to take appropriate action to avoid hitting something; and the alcohol level would affect his ability to judge distances of approaching objects.

Officer Robert Benson prepared a sketch map of the accident scene. Benson opined that the location of the car after the accident indicated that the defendant had tried to cut the corner when he initiated his left turn at the intersection. Edmund Sullivan, the defendant's accident reconstruction expert, testified that the impact of the motorcycle into the car drove the car sideways five to ten feet, and that the defendant had in fact properly initiated the turn. An eyewitness testified that the car had been driven sideways by the impact.

After considering the evidence, the jury acquitted the defendant of two counts of manslaughter in the second degree with a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 53a-56b.[3] The jury found him guilty of two counts of misconduct with a motor vehicle in violation of General Statutes § 53a-57. After the court denied the defendant's posttrial motion for judgment of acquittal notwithstanding the verdict, the defendant was sentenced to a term of incarceration and a period of probation. This appeal followed.

I

The defendant claims that the trial court should have granted his motion for a judgment of acquittal because the evidence before the jury was insufficient to sustain

---

[3] General Statutes § 53a-56b (a) provides: "A person is guilty of manslaughter in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes the death of another person as a consequence of the effect of such liquor or drug."

the verdict of guilty of misconduct with a motor vehicle. "A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person." General Statutes § 53a-57 (a). The defendant argues that the evidence failed to show that (1) he acted with criminal negligence and (2) his conduct was the proximate cause of the victims' deaths. We disagree.

An accused has a fundamental right to an acquittal under both the United States constitution and the Connecticut constitution where the state has failed to prove beyond a reasonable doubt each and every element of the crime charged. *In re Winship,* 397 U.S. 358, 362, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Hill,* 201 Conn. 505, 512, 523 A.2d 1252 (1986). Appellate review of a claim of insufficiency of the evidence is a twofold task: We must first review the evidence by construing it in the light most favorable to sustaining the verdict. We must then determine whether, on the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt. In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. *State* v. *Marra,* 215 Conn. 716, 726, 579 A.2d 9 (1990).

## CRIMINAL NEGLIGENCE

General Statutes § 53a-57 (a) provides that "[a] person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person." General Statutes § 53a-3 (14) provides that "[a] person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and

unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." "[C]onviction of misconduct with a motor vehicle requires proof of the mental state involved in criminal negligence . . . ." *State* v. *Kristy,* 11 Conn. App. 473, 482, 528 A.2d 390, cert. denied, 206 Conn. 801, 535 A.2d 1315 (1987). Proof of that mental state requires that "the failure to perceive [a substantial and unjustifiable risk that death will result] must be a gross deviation from the standard of a reasonable man; thus, it requires a greater degree of culpability than the civil standard of negligence." Connecticut General Statutes Annotated § 53a-3 (West 1985), Commission Comment.

The defendant argues that his conduct in the operation of the car "constituted ordinary, garden variety negligence" and was not of the "egregious nature required by the statute, unless one adopts a rule that the act of getting behind the wheel while intoxicated is per se misconduct." Further, the defendant asserts that the legislative history of § 53a-57 refutes the view that intoxication proves criminal negligence. While we agree with the defendant's statutory analysis, we do not believe it alters our conclusion that the jury could reasonably have concluded that the defendant was criminally negligent in the operation of a motor vehicle.

Prior to 1982, General Statutes (Rev. to 1981) § 53a-57 provided that "[a] person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle *or in consequence of his intoxication while operating a motor vehicle,* he causes the death of another person. . . ." (Emphasis added.) Thus, the statute provided two alternative bases for criminal liability. *State* v. *Singleton,*

174 Conn. 112, 117, 384 A.2d 334 (1977), cert. denied, 440 U.S. 947, 99 S. Ct. 1425, 59 L. Ed. 2d 635 (1979).

In 1982, Public Acts No. 82-403 created two statutes where one had existed previously. All reference to intoxication was removed from § 53a-57, a class D felony. The new statute, General Statutes (Rev. to 1983) § 53a-56b (a), a class C felony, provided that "[a] person is guilty of manslaughter in the second degree with a motor vehicle while intoxicated when, in consequence of his intoxication while operating a motor vehicle, he causes the death of another person. For the purposes of this section, 'intoxication' shall include intoxication by alcohol or by drug or both."[4] The differences between the two offenses are significant; the statutes do not stand in relation of greater and lesser included offenses. See *State* v. *Kristy,* supra.[5] The essential questions for the trier of fact on a charge of manslaughter in the second degree with a motor vehi-

[4] General Statutes § 53a-56b (a) was amended in 1985 to its present language. See footnote 3, supra.

[5] Although *State* v. *Kristy,* 11 Conn. App. 473, 482, 528 A.2d 390, cert. denied, 206 Conn. 801, 535 A.2d 1315 (1987), was decided under the prior version of General Statutes § 53a-56b; see footnote 4, supra; we do not believe that this change affects the conclusion reached in *Kristy* concerning the relationship between §§ 53a-56b and 53a-57.

No. 85-147 of the 1985 Public Acts "remove[d] the language in [General Statutes] § 53a-56b . . . that referred to a person's being 'intoxicated' and instead . . . insert[ed] the requirement that a person has to be 'under the influence' in order to 'get tough on drunk drivers' and to avoid the result . . . where an individual escaped liability under the law because . . . the individual was not 'intoxicated' even though he may have been under the influence." *State* v. *Kwaak,* 21 Conn. App. 138, 143–44, 572 A.2d 1015, cert. denied, 215 Conn. 811, 576 A.2d 540 (1990); see also *Sanders* v. *Officers Club of Connecticut, Inc.,* 196 Conn. 341, 349–50, 493 A.2d 184 (1985). This change in statutory language, however, does not alter the basis of this court's conclusion in *State* v. *Kristy,* supra, 481–84, that there are differences between §§ 53a-56b and 53a-57 and that the two statutes do not stand in relation of greater and lesser included offenses. Consumption of alcohol, whether to the point of influence or intoxication, is not required to prove a violation of § 53a-57, while proof of a defendant's mental state still plays no part in a violation of § 53a-56b.

cle while under the influence of intoxicating liquor are "whether the defendant was [under the influence of intoxicating liquor] while operating a motor vehicle and whether the death of another person was a consequence of that [conduct]. . . . [By contrast] misconduct with a motor vehicle requires proof of the mental state involved in criminal negligence which is not an element of manslaughter." Id., 482. Thus, in a prosecution for misconduct with a motor vehicle in violation of General Statutes § 53a-57, proof that the driver was under the influence of intoxicating liquor is neither necessary nor sufficient to warrant conviction because it is the driver's mental state that is in issue. Id., 483. The essential questions for the trier of fact on a charge of misconduct with a motor vehicle are whether the defendant operated a motor vehicle with criminal negligence and whether that conduct caused the death of another person. Nevertheless, the fact that a driver was under the influence of intoxicating liquor can be relevant, if not highly relevant, in the jury's consideration of those questions.

For this reason, although the defendant correctly points out that operation of a motor vehicle while under the influence of intoxicating liquor is not per se criminal negligence, a jury may still conclude, under the circumstances of a particular case, that the defendant was criminally negligent when he operated his vehicle while under the influence of intoxicating liquor. Thus, in *State v. Dawson,* 23 Conn. App. 720, 723–24, 583 A.2d 1326 (1991), the evidence showed that the defendant operated his motor vehicle after consuming enough alcohol to achieve a blood alcohol level of 0.16, proceeded at a rate of speed far greater than the posted speed limit, drove onto the soft shoulder of an s-curve, reentered the roadway, locked his brakes and skidded 120 feet across the center line into the victim's car. We noted that, on the basis of the evidence adduced in that

case, the jury could have reasonably found, beyond a reasonable doubt, that the defendant failed to perceive that he was taking a substantial and unjustifiable risk of being unable to control his motor vehicle and killing another person both in driving his motor vehicle with an elevated blood alcohol content and in driving at an excessive speed. Id., 723. Yet, we concluded that *"the risks of being unable to control his car after drinking* and of killing another while on the road were such that the failure to perceive them constituted a gross deviation from the standard of care of a reasonable person."* (Emphasis added.) Id., 724.

Likewise, in the present case, there was sufficient evidence from which a jury could reasonably conclude beyond a reasonable doubt that the defendant was criminally negligent. The jury could have reasonably concluded that some time before 3:30 p.m. on May 26, 1990, the defendant consumed sufficient alcohol, equal to between nine and twelve beers, to bring his blood alcohol content to between 0.19 and 0.24, that the alcohol he consumed affected his coordination and motor skills, that he then entered his vehicle to drive around New Haven, and in doing so he failed to perceive the substantial and unjustifiable risk that he would be unable to take proper safety precautions, to judge the speed of approaching vehicles, and to react appropriately to traffic hazards, and that he could thereby kill another person.[6] In addition, the jury could also have concluded that the defendant cut the corner when making a left

---

[6] In his reply brief, the defendant suggests that "the jury, by rendering a not guilty verdict on the manslaughter charge, determined either that the defendant was not intoxicated, or that his intoxication did not cause the deaths of the Wickers." We do not agree. Simply put, collateral estoppel principles do not apply in a single trial to preclude a verdict of guilty on an offense which includes elements in common with an offense for which the jury has returned a verdict of not guilty. See *State* v. *Aparo,* 223 Conn. 384, 391–92, 614 A.2d 401 (1992); *State* v. *Bailey,* 209 Conn. 322, 344–45, 551 A.2d 1206 (1988); *State* v. *Jackson,* 194 Conn. 241, 245, 478 A.2d 1018

turn onto Trumbull Street, despite the fact that his view of oncoming traffic was obscured; that he failed to observe or judge the speed of the approaching motorcycle properly; and that in doing so failed to perceive the substantial and unjustifiable risk that he would collide with an oncoming vehicle and kill another person. Finally, the jury could reasonably have concluded that the defendant's failure to perceive these risks was a gross deviation from the standard of care that a reasonable person would observe in the situation. Consequently, the defendant's argument to the contrary notwithstanding, there was ample evidence to support the jury's determination that the defendant's conduct in the operation of his motor vehicle constituted criminal negligence.

### CAUSATION

The defendant also claims that there was insufficient evidence from which the jury could conclude beyond a reasonable doubt that the defendant's conduct caused the deaths of the Wickers. He argues that both the negligent conduct of the motorcycle driver and the fact that no witnesses observed similar misconduct on his part in the operation of his vehicle, preclude a finding that his conduct proximately caused the deaths. We do not agree.

In *State* v. *Alterio,* 154 Conn. 23, 220 A.2d 451 (1966), our Supreme Court considered a statute quite similar to § 53a-57.[7] The *Alterio* court concluded that "[i]t was

(1984); *State* v. *Stevens,* 178 Conn. 649, 653–56, 425 A.2d 104 (1979). Consequently, we may rely on evidence of alcohol consumption and its effects in our consideration of whether the evidence was sufficient to sustain the defendant's conviction of misconduct with a motor vehicle.

[7] The statute under consideration in *Alterio* provided in pertinent part that "any person operating a motor vehicle upon the highways of this state who, in consequence . . . of gross negligence, causes any loss of life" shall be subject to the penalty provided. *State* v. *Alterio,* 154 Conn. 23, 25, 220 A.2d 451 (1966).

the state's burden to prove that a proximate cause of the death was the unlawful acts of the defendants . . . [and that] '[e]very person is held to be responsible for the natural consequences of his acts, and if he commits a felonious act and death follows, it does not alter its nature or diminish its criminality to prove that other causes cooperated to produce that result.' *State* v. *Leopold,* [110 Conn. 55, 61, 147 A. 118 (1930)]." (Citations omitted.) *State* v. *Alterio,* supra, 29–30; see also *State* v. *Spates,* 176 Conn. 227, 233, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979). "An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the resulting death." Id., 234. The contributory negligence of the victim does not prevent proof of causation, unless it constitutes an independent and efficient cause or an intervening and efficient cause. *State* v. *Kwaak,* 21 Conn. App. 138, 145–46, 572 A.2d 1015, cert. denied, 215 Conn. 811, 567 A.2d 540 (1990).

In the present case, the jury could reasonably have found, beyond a reasonable doubt, that the criminally negligent conduct of the defendant while operating a motor vehicle caused the deaths of the Wickers. The jury could have concluded that but for the defendant's failure to negotiate the turn properly and his failure to yield the right-of-way to the approaching motorcycle, the car and the motorcycle would not have collided. The jury could also have reasonably found that the negligent conduct of Charles Wicker, even if such conduct contributed to the deaths, was neither an independent and efficient, nor an intervening and efficient cause. The defendant's argument to the contrary notwithstanding, we believe that the jury, after considering all of the evidence, could reasonably have found that had the defendant carefully looked for approaching traf-

fic, appropriately assessed the speed of the oncoming motorcycle, and quickly responded to the existing and foreseeable traffic hazard, his car would not have been crossing the northbound lanes of Prospect Street at the critical moment, and the speeding motorcycle would have passed by safely. The criminally negligent conduct of the defendant, therefore, was a substantial link in the unbroken chain of events that resulted in the deaths of the Wickers, and the jury properly held the defendant answerable for the consequences of his conduct. *State* v. *Spates,* supra.

Accordingly, the evidence was sufficient to sustain the jury's verdict of guilty on the two counts of misconduct with a motor vehicle in violation of General Statutes § 53a-57. We, therefore, conclude that the trial court properly denied the defendant's motion for judgment of acquittal notwithstanding the verdict.

## II

The defendant next challenges the trial court's instruction on the concept of proximate cause. The trial court instructed the jury on causation: "Proximate cause is defined in criminal law as not necessarily the last act that caused or act in point of time nearest to death; the concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is a proximate cause when it substantially and materially contributes, in a natural and a continuous sequence, unbroken by an efficient, intervening cause, to the resulting deaths. It is the cause without which the death would not have occurred and the predominating cause, and a substantial factor, from which death follows as a natural, direct and immediate consequence. In this case, obviously both sides have a different view as to what the cause of the death was and that is as a trier

of fact what you determine." The defendant concedes, as he must, that this is a proper definition of the concept of proximate cause. See *State* v. *Spates,* supra, 233–34; *State* v. *Kwaak,* supra, 145–46. The defendant argues, however, that the instruction was incomplete, and therefore failed to instruct the jury properly, because it did not include the language of his request to charge on the issue of causation.[8] We disagree.

"While a request to charge that is relevant to the issue of the case and is an accurate statement of the law must be given, the trial court is not required to charge in the identical language requested if its charge is accurate, adequate and, in substance, properly includes material portions of the defendant's request. . . . Thus, the trial court properly discharges its duty when it gives instructions to the jury in a manner calculated to give them a clear understanding of the issues presented for their consideration, under the

---

[8] The defendant submitted the following written request to charge on the issue of causation in the context of the manslaughter charge: "Proof of causation must be established by sufficient evidence to remove the issue from the field of surmise, conjecture, guesswork and speculation. . . . In this case, the evidence must exclude all other reasonable possibilities as to the cause of the accident other than the alleged intoxication of the driver.

"There is evidence that the Wicker motorcycle was obscured from the defendant's vision as he approached the intersection. There is also evidence alleging that the motorcycle was travelling at a high rate of speed, and that the passenger was seated in front of the motorcycle operator, which may or may not have interfered with the operator's ability to control his motorcycle. You are instructed that you may consider these claims as evidence of the cause of the accident, independent of the alleged intoxication of the defendant. When, as here, there is some evidence from which you might conclude that the accident was caused by some factors other than the defendant's alleged intoxication, the State must prove to you, beyond a reasonable doubt, that none of these factors could have caused the accident."

Although we are unable to locate any written requests to charge in the trial court file, the defendant asserts in his brief that this request to charge was filed with the trial court and the state does not dispute this assertion. We therefore consider that the defendant has adequately preserved this claim for our review. See Practice Book § 852.

offenses charged and upon the evidence, and when its instructions are suited to their guidance in the determination of those issues." (Citation omitted; internal quotation marks omitted.) *State* v. *Bunker,* 27 Conn. App. 322, 328, 606 A.2d 30 (1992). Under this standard of review, we conclude that the trial court properly instructed the jury.

The defendant's request to charge is not a correct statement of the law of causation. While it is correct that proof beyond a reasonable doubt of each element of an offense must exclude reasonable hypotheses of innocence; see, e.g., *State* v. *Hammond,* 221 Conn. 264, 288, 604 A.2d 793 (1992);[9] it does not follow that proof beyond a reasonable doubt that the defendant caused the victims' deaths must exclude any reasonable possibility that the victims' conduct was also a cause of the deaths. Rather, the state fails in its proof that an accused's criminally negligent conduct caused the death of another when the jury finds "either that the defendant's [criminal negligence] was not the actual 'but for' cause of the victim's death or that there was an 'independent and efficient cause'; *State* v. *Alterio,* supra [30]; or an intervening and efficient cause. *State* v. *Spates,* supra." *State* v. *Kwaak,* supra, 146. Contrary to the defendant's argument, it is well settled that "if [a person] commits a felonious act and death follows, it does not alter its nature or diminish its criminality to prove that other causes co-operated to produce that result." (Internal quotation marks omitted.) Id., 145.

The defendant argues, nonetheless, that in *State* v. *Kwaak,* supra, 161, we approved of a jury instruction that required that " '[w]hen as here there is some evidence from which you might conclude that the vehicular accident was caused by some factors, other than

---

[9] The trial court adequately and exhaustively instructed the jury on this concept in its instructions on reasonable doubt.

the defendant's intoxication, *the state must prove to you beyond a reasonable doubt that none of these factors could have caused the accident.'* " (Emphasis in original.) The defendant, however, misreads our approval of that language. The quoted language was referred to in that portion of *State* v. *Kwaak,* supra, wherein we considered a challenge to the trial court's instruction on reasonable doubt. The trial court had improperly instructed the jury that "the evidence must exclude all other reasonable *probabilities* as to the cause of the vehicular accident other that the alleged intoxication of the defendant." (Emphasis added.) Notwithstanding this erroneous instruction, we concluded that the court's charge, when taken as a whole, did not impermissibly dilute the state's burden of proof. The improper use of the word "probabilities" instead of "possibilities" was deemed to be harmless in the context of the charge as a whole, in part because the court had correspondingly *increased* the state's burden of proof in stating that " 'the state must prove to you beyond a reasonable doubt that none of these [other, nonculpable] factors could have caused the accident.' " Id. Consequently, we do not read this portion of the *Kwaak* decision to affect in any way the well settled principle, stated elsewhere in the *Kwaak* decision, that "the causation element requires that the state prove beyond a reasonable doubt, first that the death of a person would not have occurred 'but for' the defendant's [culpable conduct], and second, that the defendant's [conduct] substantially and materially *contributed* to the death of a person in a natural and continuous sequence, unbroken by an efficient, intervening cause." (Emphasis added.) Id., 146.

Accordingly, we conclude that the trial court properly instructed the jury on all aspects of the concept of proximate cause.[10]

---

[10] As a corollary to his challenge to the court's instruction on causation, the defendant claims that the trial court improperly instructed the jury that

The judgment is affirmed.

In this opinion the other judges concurred.

it must determine "whether the state has proven beyond a reasonable doubt that this *accident* was caused as a consequence of intoxication." (Emphasis added.) After the defendant excepted to the instruction, the court reinstructed the jury: "[I]n my comments regarding manslaughter with a motor vehicle on causation I mentioned 'accident' and not 'death,' but obviously *under the statute a death has to result.* In this case, I think it is factually supported there was an accident and two deaths resulted, so the fact of the causation and the deaths I think the testimony supports that as a result of the accident there were two deaths." (Emphasis added.) The defendant claims that the court's supplemental instruction "reinforced the original misstatement [and] did so in wording that could have led the jury to believe the court was finding causation as a fact, which was tantamount to directing a verdict [of guilty]." We do not agree.

Although not a model of clarity, the court's supplemental instruction, when read in conjunction with the entire jury charge, adequately informed the jury that it was required to find that the defendant's culpable conduct caused the deaths, not simply that it caused an accident. In light of the parties' stipulation that the victims died as a result of the collision between the car and the motorcycle; see footnote 2, supra; however, the defendant's remaining claims regarding any alleged impropriety in the supplemental instruction are without merit. As we have already concluded, the jury was fully and adequately instructed on the element of causation. The challenged supplemental instruction did not undermine those otherwise proper and complete instructions.