STATE OF CONNECTICUT *v.* MARC PERUCCIO
(AC 15626)

Foti, Lavery and Freedman, Js.

Argued September 15—officially released November 25, 1997

*Kimball Haines Hunt,* for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Rosita M. Creamer,* assistant state's attorney, for the appellee (state).

### Opinion

LAVERY, J. The defendant, Marc Peruccio, appeals from the judgment, rendered after a jury trial, convicting him of manslaughter in the first degree in violation of General Statutes § 53a-55 (a),[1] and risk of injury to a child in violation of General Statutes § 53-21.[2] On

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[2] General Statutes (Rev. to 1993) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or morals likely to be impaired, or does

appeal, the defendant claims that the trial court improperly (1) denied his motion for a judgment of acquittal when the evidence was insufficient to support a verdict of guilty and (2) admitted into evidence testimony concerning injuries the child suffered when left in the exclusive care of the defendant. We disagree and affirm the judgment of the trial court.

The jury could reasonably have found the following facts. The victim, Erik Pare, was born on August 23, 1992, and died on September 2, 1993. He lived with his mother, Melanie Pare. The defendant had lived with the victim and his mother for a period of time ending in August, 1993. On occasion, the victim's mother left the child in the care of the defendant. On one such occasion, Candy Resto, a neighbor of the Pares, observed burn marks on the child's right little finger. When asked about the burn marks, the defendant replied that the child had burned his finger on a cigarette in an ashtray. When the victim's mother inquired about the same burn marks, the defendant responded that the child had burned his finger when touching a light in a lizard cage at Resto's home.[3]

In August, 1993, prior to the child's first birthday, the victim's mother went out to a convenience store, leaving the child in the care of the defendant. Upon her return, she noticed blood on the child's lip, cuts on the inside of his mouth, and blood on the door at the approximate height of the child's face. The child was unable to walk at this time but could crawl and pull himself to stand. When asked about these injuries, the defendant

any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

[3] At trial, Resto testified that the lizard cage was four and one-half feet off the ground and that it was not possible for a child to gain access to the light in that cage.

responded that the child had crawled after the child's mother when she left and then had fallen at the door.

On September 1, 1993, the victim had a scheduled physical examination with a pediatrician. No abnormalities were evident at that examination. That same day, the victim and his mother spent time with his grandmother who did not observe any marks on the child's face or any irregular behavior. Upon returning home with his mother, the child fell on his back once and cried, but resumed normal activities after he stopped crying.

On September 2, 1993, the grandmother watched the child for several hours. No marks or irregular behavior on the part of the victim were noticed. After the victim ate dinner, the defendant came to care for the child while the child's mother went shopping with a friend. The victim was put to bed by his mother at approximately 7 p.m. The defendant was informed by the victim's mother that the child was tired and whiny because he was teething and had not taken a good nap. The victim's mother left the house at approximately 7:30 p.m.

At approximately 8 p.m., Raleigh Johnson, who lived in Resto's house, was standing outside talking to friends and observed the defendant, who was carrying the victim, walk up the street and sit down. The victim was being cradled by the defendant and appeared to be sleeping. After Johnson's friends left, the defendant accompanied Johnson into Johnson's house. Johnson and Resto heard the victim breathing heavily and asked if anything was wrong with him. The defendant replied that he did not know, that the child was possibly sick, that nothing was wrong, and that the victim was sleeping. A few minutes later the defendant left and returned

to the victim's home. At no time while inside Johnson and Resto's home did the defendant put the child down.

At approximately 8:40 p.m., a paramedic unit was dispatched to the victim's home to respond to a call concerning a baby who was not breathing. Upon arriving on the scene, the paramedic observed the victim on the floor with vomit in his mouth and the defendant on the phone with 911 dispatchers who were attempting to instruct him on how to perform CPR. The victim had no pulse and was not breathing. He was taken by ambulance to Manchester Hospital and examined by Ronald D'Angelo, an emergency room physician. The defendant told D'Angelo that the victim had choked while being fed, that his head had rolled back, and that he had stopped breathing. In the emergency room, a bruise on the victim's forehead, a retinal hemorrhage and the dilation of one eye were observed. The victim's condition did not change and attempts to resuscitate the victim ceased at 11:12 p.m.

Prior to going shopping on September 2, 1993, the victim's mother had arranged the victim's dirty clothing in various piles for laundering. At trial, the victim's mother testified that the piles of clothing had been moved. In particular, the police investigation discovered a shirt with blood stains lying on top of one of the piles. The victim's mother testified that at the time she went shopping, this shirt was inside a plastic bag next to the child's crib. The state police forensics laboratory was unable to determine the type of blood on the shirt. The laboratory did discover, however, that the victim's blood and the blood on the shirt both contained phosphoglucomutase one plus, indicating a possible match. In addition, the blood on the shirt was found to be mixed with saliva and epithelial cells, which line the mouth, throat, and digestive tract lining.

At trial, D'Angelo testified that the victim's retinal hemorrhage was typical of the trauma associated with

the shaking of a baby, but that trauma to the head of an infant can have the same effect as shaking. In addition, D'Angelo testified that the victim's retinal hemorrhage and the dilation of one of his pupils were indications of a brain injury that had progressed to a dangerous or emergent point.

On September 3, 1993, Thomas Gilchrist, an associate medical examiner, performed an autopsy on the victim. He testified that the autopsy revealed that the victim was well nourished and without chronic illness, and that there were small abrasions on the forehead, a bruise on the left cheek, superficial lacerations on the inside of the mouth, and a small area of bleeding due to a laceration under the upper lip. Gilchrist testified that due to an absence of scabs, in his opinion, the abrasions and lacerations were fresh. The autopsy also revealed a large number of hematomas, or accumulations of blood, located between the scalp and the skull and found on all sides of the victim's head, which Gilchrist concluded were inflicted shortly before the victim's death. In addition, the autopsy revealed small accumulations of blood between the dura, the thick membrane covering the brain, and the brain.

Gilchrist concluded that the cause of death was blunt trauma to the head.[4] He also testified that the specific mechanism of death was brain swelling, or cerebral edema, incident to the trauma. The trauma could have been caused by either direct blows to the victim's head or the striking of the victim's head against a fixed object. Gilchrist further testified that in his opinion the injuries to the victim's head were fresh. Although unable to determine the exact time of injury, he testified that in his experience, in the majority of cases, the blows

[4] The defendant's chief argument on appeal is that the testimony of his expert witness concerning brain injuries was enough to counter Gilchrist's testimony. That is a question of credibility. We find no merit in that argument.

resulting in cerebral edema occurred within the hour prior to the child's arrival at the hospital. In addition, he testified that vomiting of the gastric contents is a part of the dying process.

I

The defendant first claims that the evidence produced at trial was insufficient to support the jury's verdict finding him guilty of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) or (3). This claim was raised in a timely fashion in the trial court by an unsuccessful motion for acquittal after the jury had rendered its verdict.

"We begin our analysis by restating the principles that guide and define the scope of our review. When called on to review a challenge to the sufficiency of the evidence to support a conviction, we undertake a two part analysis. . . . First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Cintron*, 39 Conn. App. 110, 118, 665 A.2d 95 (1995).

" '[W]e have repeatedly stated that our review of the conclusions of the trier of fact, whether it be a judge, a panel of judges or a jury, is limited. . . . This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same.' " (Citations omitted.) *State* v. *DeJesus*, 236 Conn. 189, 200, 672 A.2d 488 (1996).

In deciding whether the defendant was responsible for the injuries that caused the child to die, the jury had both the right and the duty to rely on the evidence introduced and the inferences reasonably drawn therefrom. *State* v. *Tucker*, 181 Conn. 406, 418, 435 A.2d 986 (1980); *State* v. *Avcollie*, 178 Conn. 450, 456, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980); *State* v. *Chapman*, 46 Conn. App. 24, 35, 698 A.2d 347, cert. denied, 243 Conn. 947, 704 A.2d 800 (1997). "In viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Cintron*, supra, 39 Conn. App. 119.

The evidence was sufficient for the jury to find that the defendant had the opportunity to commit the crime during the time when the child was in his exclusive care. The jury also had sufficient evidence before it to find that on September 2, 1993, when the mother left the child in the care of the defendant, the child was a normal, healthy one year old without bruises, scratches or any other abnormalities that might lead to death, that the child's injuries were not caused accidentally, and that the child's injuries resulting in his death occurred during the time when he was in the exclusive control of the defendant and were caused by the defendant.

"When there is evidence that . . . the injuries occurred while the child was in the sole [care] of the [defendant], the [jury] is permitted to infer not only that the child's injuries were not accidental but that, in addition, they occurred at the culpable hands of [the

defendant]." (Internal quotation marks omitted.) *State* v. *Chapman,* supra, 46 Conn. App. 34, quoting *State* v. *Dumlao,* 3 Conn. App. 607, 623, 491 A.2d 404 (1985). These were logical inferences that the jury could reasonably draw and from which the jury could find the defendant guilty beyond a reasonable doubt. *State* v. *Dumlao,* supra, 623.

We will not second guess the jury's verdict on the basis of some vague, speculative or amorphous feeling that some doubt of guilt is shown by the cold printed record. *State* v. *Chapman,* supra, 46 Conn. App. 35. We have not had the jury's opportunity to observe the conduct, demeanor and attitude of the witnesses, and to gauge their credibility. See id.

We conclude that the evidence presented at trial was sufficient to support the defendant's conviction of manslaughter in the first degree.

## II

The defendant next contests the admissibility of certain evidence that the trial court permitted the jury, with limiting instructions, to hear. At trial, testimony was offered by the victim's mother and by a neighbor concerning injuries the child suffered on past occasions when left in the exclusive care of the defendant. None of those acts was directly related to the child's death. The defendant took timely objection to those lines of testimony, contending that the evidence lacked relevance and was more prejudicial than probative.

The trial court instructed the jury that it could use this testimony only to establish intent, motive or a pattern of conduct on the part of the defendant. In addition, the trial court instructed the jury that it could not draw the inference that if the defendant did these things he is a

bad person and more likely to have committed the crimes charged. Also, the jury was instructed that it could not infer that if someone had done something wrong in the past he is more likely to have done something wrong in this case.

The defendant argues here that the challenged testimony lacked any probative value and was irrelevant and prejudicial. The witnesses' testimony concerned a burn that the child received on his finger while in the care of the defendant as to which the defendant gave two different explanations, and a cut on the child's lip that he received while in the defendant's exclusive care. While it is true that those acts do not in and of themselves prove intent to cause serious physical injury, "they are relevant to establish, in connection with the question of intent, a pattern of behavior and an attitude toward the child that is indicative of the defendant's state of mind." *State* v. *Tucker*, supra, 181 Conn. 415.

"As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior." (Citations omitted.) *State* v. *Kulmac*, 230 Conn. 43, 60, 644 A.2d 887 (1994). Exceptions to the general rule exist, however, "if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime." (Internal quotation marks omitted.) *State* v. *Adorno*, 45 Conn. App. 187, 191–92, 695 A.2d 6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997); see *State* v. *Figueroa*, 235 Conn. 145, 162, 665 A.2d 63 (1995). "We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of the evidence must outweigh its

prejudicial effect." (Internal quotation marks omitted.) *State* v. *Kulmac*, supra, 61; *State* v. *Figueroa*, supra, 162.

"The primary responsibility for making these determinations rests with the trial court. We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." *State* v. *Kulmac*, supra, 230 Conn. 61; see also *State* v. *Figueroa*, supra, 235 Conn. 162–63; *State* v. *Mooney*, 218 Conn. 85, 127, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

We find no abuse of discretion on the record before us. The trial court gave instructions to the jury clearly limiting the use of this evidence to its bearing on intent, motive or pattern of conduct. The circumstances under which the crime allegedly took place effectively prohibited the state from presenting direct evidence and forced it to rely on probative inferences. *State* v. *Tucker*, supra, 181 Conn. 416. "In battered child cases, the youth of the victim and the tendency of other family members not to intervene . . . make reasonable the exercise of judicial discretion to allow evidence of prior abusive treatment of the child victim. . . . [T]he exercise of wise discretion requires the trial court to consider whether other evidence, equally probative and less prejudicial, was available to the state." (Citations omitted.) Id., 416–17; *State* v. *Wilson*, 199 Conn. 417, 447, 513 A.2d 620 (1986). In this case, because the state lacked equally probative and less prejudicial evidence, additional support is given to the trial court's decision. *State* v. *Tucker*, supra, 417; *State* v. *Wilson*, supra, 447.

In light of the inherent difficulties of the balancing process and the limiting instructions given to the jury, we are satisfied that the trial court did not abuse its

discretion in concluding that the probative value of the evidence exceeded its prejudicial effect. Accordingly, we conclude that there was no abuse of the trial court's discretion in its decision to admit evidence of prior instances in which the child suffered injuries while in the exclusive care of the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.