STATE OF CONNECTICUT *v.* PAUL CARTER
(AC 20210)

Foti, Schaller and O'Connell, Js.

Argued April 25—officially released July 31, 2001

*Richard E. Condon, Jr.*, special deputy assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, assistant state's attorney, with whom were *Gail Hardy*, assistant state's attorney, and,

on the brief, *John A. Connelly*, state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Paul Carter, appeals from the judgment of conviction, rendered following a trial before the court, of misconduct with a motor vehicle in violation of General Statutes § 53a-57.[1] On appeal, the defendant argues that the state failed to present sufficient evidence to prove beyond a reasonable doubt that he acted with criminal negligence. We affirm the judgment of the trial court.

The court found the following facts relevant to the defendant's conviction under § 53a-57.[2] At approximately 5 o'clock in the evening, during rush hour, Neil Johnson was traveling in the northbound lane on Route 8 in Waterbury, just before exit thirty-six. Traffic was heavy and moving quickly. Johnson ran out of gasoline, left his vehicle on the shoulder of the highway and telephoned his wife, requesting that she bring him some gasoline.

When Johnson returned to his car, he noticed a truck stopped on the shoulder behind his vehicle. The truck's

[1] General Statutes § 53a-57 (a) provides: "A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person."

[2] On June 18, 1999, the court explained its factual findings and rendered its verdict in open court. The court subsequently filed a memorandum of decision, which the clerk issued on August 24, 1999.

The state charged the defendant with misconduct with a motor vehicle under § 53a-57 (a) and with the lesser included offense of negligent homicide with a motor vehicle in violation of General Statutes § 14-222a. That statute provides: "Any person who, in consequence of the negligent operation of a motor vehicle, causes the death of another person shall be fined not more than one thousand dollars or imprisoned not more than six months or both." General Statutes § 14-222a. The defendant concedes that his conduct was sufficient to support a conviction under § 14-222a. The court also found that the defendant had operated a motor vehicle while his license was under suspension in violation of General Statutes § 14-215 (a), as the state also charged. The defendant challenges only his conviction under § 53a-57.

operator, Ralph Bird, also had run out of gasoline. Johnson spoke with Bird and told him that he would share some of the gasoline that his wife was bringing to him. Johnson's wife arrived shortly thereafter. After Johnson poured some of the gasoline into his vehicle's tank, he gave the gasoline can to Bird, who then proceeded to pour its contents into his truck's gasoline tank. Johnson recalled that he watched Bird "very closely" and that at no point did Bird step onto the travel portion of the highway.

Just prior to this time, Richard Felten also was driving in the northbound lane on Route 8 in Waterbury. A white Volkswagen Jetta, operated by the defendant, moved two feet into his lane. Felten observed that the defendant was "bent over in a position . . . bent further down to the right . . . it seemed like he was working on the radio or like he was installing the radio or something under the dash," and was unable to see the road or where his car was going. After a few seconds, the defendant sat up and made eye contact with Felten. The defendant appeared "apathetic . . . like he didn't care what he did."

Approximately thirty seconds later, Felten noticed the defendant's vehicle, then traveling in the right lane, move across the solid white line that separates the travel lane from the shoulder of the highway. Felten could not see the defendant's head through the rear window of the defendant's vehicle, as he would have expected. Felten observed, once again, that the defendant appeared to be working on something underneath the dashboard.

A second or two after Felten made those observations, he noticed Bird standing off to the right shoulder of the highway, pouring gasoline into his truck. He observed the defendant's vehicle strike Bird, heard a scream and observed that Bird "disappeared." Felten

stopped his car beyond the scene of the crash and noticed the defendant sitting in his car near the guardrail with a "blank" stare. Johnson also observed the defendant's vehicle leave the travel portion of the highway, strike the rear of Bird's truck and strike Bird. Bird died as a result of his injuries.

Johnson's wife, Marybeth Johnson, testified that when she came upon both her husband's vehicle and Bird's truck, they were parked on a flat, straight portion of the highway. She recalled that she was able to see the vehicles "quite clearly" from approximately one hundred feet or more as she approached them. She also witnessed the defendant's vehicle strike Bird, her husband's vehicle and her truck. She recalled that, after the accident, she had yelled to the defendant and had told him to get out of his vehicle. She noticed that the defendant had a "blank" look on his face and that he was nonresponsive.

After leaving his vehicle, the defendant sat on a nearby guardrail. Jose Campos, a Connecticut state police trooper, spoke with the defendant at the scene of the accident. At that time, the defendant stated that he did not know what had happened. At the hospital, the defendant told Campos that he thought he was hit. Later, while at the state police barracks, the defendant told Campos that he "thought and felt that he could have fallen asleep," but that it was "a blank."

William Cairo, a Connecticut state trooper duly qualified as an expert in accident reconstruction, testified that the defendant's vehicle strayed no more than three feet into the shoulder from the travel portion of the highway. The defendant was traveling at a normal rate of speed. The defendant, however, did not apply his brakes prior to the accident to avoid the collision. Steve Babasick, a certified mechanic with over twenty years experience, testified that he had inspected the defen-

dant's vehicle and that it did not have any mechanical problems that would have contributed to the accident.

The defendant did not refute any of the state's evidence. The defendant argued that the facts were not in dispute and that the case involved questions of law.[3] The court concluded that the defendant was operating his vehicle while in an impaired condition and, therefore, was unable to maintain visual contact with the road. The court further concluded that the defendant's operating his vehicle under the traffic conditions that existed at the time of the accident while not maintaining visual contact with the road "created a substantial and unjustifiable risk of death or serious body injury to other persons traveling on the road."

The court reasoned that "[t]he defendant had an opportunity to perceive that he was unable to see where he was driving" because he resumed an upright position after he encroached on Felten's lane. The court concluded that, by failing to pull off the road, the defendant demonstrated that he either failed to perceive or ignored the fact that driving in his condition posed a risk to other drivers. The court characterized the defendant's decision to continue to drive in this condition to be "a gross deviation from the standard of care which a reasonable person would observe in such a situation. Consequently, by continuing to drive, the defendant acted with criminal negligence."

The court noted the defendant's second "relapse," which rendered him unable to maintain visual contact with the road for a second time. The court found that, as a result of his criminal negligence, the defendant failed to see the vehicles on the shoulder of the highway and caused Bird's death. In reaching its decision, the court stated that "[t]he defendant did not refute the

---

[3] At the close of the evidence, the defendant filed a motion for a judgment of acquittal, thereby preserving this issue for our review.

testimony that he recovered from his lapse of consciousness after nearly colliding with Mr. Felten and thus had the opportunity to perceive the substantial and unjustifiable risk of death or serious bodily injury which driving in his condition posed to himself and others." This appeal ensued.

The defendant claims that the evidence in the record does not support the court's conclusion that he acted with criminal negligence. He argues, essentially, that the evidence does not support the court's findings that he lost consciousness when he encroached on Felten's lane, that he regained his awareness and that he lost consciousness once again just prior to striking Bird.

"Our standard of review for a sufficiency of the evidence claim is well established. In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . *State* v. *DeCaro*, 252 Conn. 229, 239, 745 A.2d 800 (2000). In conducting this review, the probative force of the evidence is not diminished where the evidence, in whole or in part, is circumstantial rather than direct. *State* v. *Wager*, 32 Conn. App. 417, 430, 629 A.2d 1146, cert. denied, 228 Conn. 912, 635 A.2d 1231 (1993)." (Internal quotation marks omitted.) *State* v. *Paris*, 63 Conn. App. 284, 288, 775 A.2d 994, cert. denied, 257 Conn. 909, 782 A.2d 135 (2001).

Section 53a-57 (a) provides that "[a] person is guilty of misconduct with a motor vehicle when, with criminal

negligence in the operation of a motor vehicle, he causes the death of another person." General Statutes § 53a-3 (14) defines criminal negligence: "A person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ."

To convict the defendant under § 53a-57, the state had the burden of proving the following three elements beyond a reasonable doubt: (1) the defendant was operating a motor vehicle; (2) the defendant caused the death of another person; and (3) the defendant possessed the mental state for criminal negligence. The defendant does not challenge the court's finding that he was operating the motor vehicle that struck Bird or that he caused Bird's death. The defendant challenges the court's conclusion that he acted with criminal negligence.

Under the statute, the state was required to prove that the defendant failed to perceive a substantial and unjustifiable risk that the manner in which he was operating his vehicle would cause the death of another. The state also had to prove that the defendant's failure to perceive that risk constituted a gross deviation from the standard of care that a reasonable person would observe in the situation. General Statutes § 53a-3 (14); see also *State* v. *Kristy*, 11 Conn. App. 473, 482, 528 A.2d 390, cert. denied, 206 Conn. 801, 535 A.2d 1315 (1987).

We find ample support in the record for the court's factual determinations. The court found that the defendant had operated his vehicle in an impaired condition when he first encroached on Felten's lane. Felten testi-

fied that he had the opportunity to, and did, observe the defendant in a bent over position.[4] The court logically could have concluded, as it did, that the defendant was unable to see either the road or where his car was heading while operating his vehicle in that position.

Felten also testified that, after the defendant's vehicle had encroached on his lane, the defendant "corrected the position of the car," and that he made eye contact with the defendant. Felten recalled noticing that the defendant's "eyes were open . . . and he just gave me a kind of dull apathetic look. He wasn't aggressive and he wasn't apologetic . . . ." The court logically could have concluded, as it did, that the defendant had operated his car while "he was unable to maintain visual contact with the road," thereby operating his vehicle while in an "impaired condition." It also was reasonable and logical for the court to have found that the defendant had the opportunity after that episode with Felten to perceive that operating his vehicle in such a manner posed a substantial and unjustifiable risk of death or serious bodily injury to other persons traveling on the road.[5]

---

[4] Felten testified in this regard as follows: "[The defendant] seemed to be bent over in a position as if he was doing something to the radio, but he seemed to be bent further down to the right and down in general than you might expect if he were adjusting a volume; it seemed like he was working on the radio or like he was installing the radio or something under the dash, but I couldn't see his hands."

[5] The court logically could have found that the defendant had an opportunity to perceive the risk caused by his impairment. Several factors demonstrate that the impairment that affected the defendant had ceased, that he had regained consciousness of and visual contact with the road, and that he had an ability to perceive the risk that he posed to others by continuing to drive. Those factors are: (1) the defendant, to some extent, resumed a more usual driving posture as evidenced by the fact that Felten was able to make eye contact with him and to observe his facial expressions; (2) the defendant looked at Felten, demonstrating an awareness of others traveling on the highway; (3) the defendant straightened his car on the highway at that time; and (4) thirty seconds passed before Felten noticed the defendant exhibiting further signs of an impairment that caused him to lose visual contact with the road and, once again, to veer from his travel lane.

Felten testified that, around thirty seconds later, the defendant's vehicle was ahead of him in his lane. The defendant, however, was traveling with his tires about two feet over the solid white line separating the travel lane from the right shoulder of the highway. Felten further recalled that he had had the opportunity to observe, and did observe, that the defendant was not sitting upright while operating his vehicle.[6] The court logically could have concluded, as it did, that the defendant exhibited the same behavior that caused his car earlier to have encroached on Felten's lane. It also was logical for the court to conclude, as it did, that the defendant was unable to maintain visual contact with the road once again at that time.

The defendant argues that the court improperly found that he suffered from a loss of consciousness, for whatever reason, both when he encroached on Felten's lane and when he subsequently crossed the solid line off to the right of the highway and ultimately struck Bird. He argues that "the most that can reasonably be inferred from [Felten's] testimony is that the defendant was in a position permitting him to work on something under the dash, which diverted his attention from the road for 'just a few seconds'. . . ."

The court's critical finding was as follows: "The defendant did, in fact, lean over while driving [his] motor vehicle, whether he was asleep, or whether he had blacked out, or whether he was doing something else at the time he was driving. In any event, he was not attentive to the road. He did encroach upon the lane of Mr. Felten and, after having done so, he sat up

---

[6] Felten's testimony in this respect is as follows: "I have a vague recollection of remembering that it didn't seem like a normal view from the back, like as if I either didn't see his head or I saw his shoulder again. I remember thinking to myself, he must be, you know, doing that again . . . ." He went on to testify that he was unclear as to whether the defendant was "[w]orking on the dash or working underneath the dash."

straight in his seat . . . ." The court further found that "[the defendant] at that time had the ability to perceive that for whatever reason, he was leaning over, be it a momentary blackout, be it having fallen asleep, be it fiddling with something under the dash, that his actions created a risk, a substantial unwarranted risk that he could cause the death of another person on the road. Instead of pulling over if he were sleepy or having some medical difficulty, or instead of paying attention to the road if he were doing something under the dash, he proceeded."

The uncontroverted evidence established that the defendant, at the least, was not paying attention to the road while operating his vehicle at a fast speed in rush hour traffic when he was, as Felten described it, driving in a "bent over" position. Felten described the defendant as "working on the radio or . . . something under the dash . . . ." After an interview with Campos, the defendant gave a written, voluntary statement in which he acknowledged that he did not recall having caused the accident, but that he believed that he could have fallen asleep. The defendant also described his recollection of the incident as a "blank."

Whether the defendant had been working on something under the dash or had fallen asleep is of little consequence to our analysis. The court had before it circumstantial evidence as to what caused the defendant to operate his vehicle while "bent over" and in an erratic manner. The court was free to "draw whatever inferences from the evidence or facts established by the evidence it [deemed] to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Peruccio*, 47 Conn. App. 188, 195, 702 A.2d 1200 (1997), cert. denied, 243 Conn. 964, 707 A.2d 1266 (1998). The state was not required to prove exactly what caused the defendant's impairment. The court had before it Felten's testimony about how the defendant appeared and

the manner in which he had operated his vehicle, as well as the defendant's own recollections of the accident. It is a matter of common sense that drivers customarily stay in their own travel lane and do not drive in a "bent over" position in the absence of some type of an impairment or distraction affecting their ability to drive in a safe manner.

Given the testimony before it, the court properly concluded that a condition affecting the defendant's ability to drive or a distraction of some type arose while the defendant was driving. The evidence also supports the court's finding that this condition was of such a nature that, after it passed, the defendant should have perceived the dangers inherent in its reoccurrence, namely, that continuing to drive created an unjustifiable risk that he would cause the death of another. The evidence further supports the court's finding that the same impairment did cause the defendant once again to lose consciousness of and visual contact with the road, as evidenced by the fact that he crossed the solid white line and failed to see Bird when he should have, which led to the impact that killed Bird.

Furthermore, those facts establish that the defendant possessed a state of mind sufficient to support a conviction under § 53a-57. We have noted that such a mental state requires proof that the failure to perceive the risk created "must be a gross deviation from the standard of a reasonable man; thus, it requires a greater degree of culpability than the civil standard of negligence." (Internal quotation marks omitted.) *State* v. *Ortiz*, 29 Conn. App. 825, 833, 618 A.2d 547 (1993). In *State* v. *Carty*, 120 Conn. 231, 180 A. 287 (1935), our Supreme Court upheld a conviction for gross negligence in the operation of a motor vehicle in violation of General Statutes § 6047, the precursor to § 53a-57. The trial court in that case found that, while operating his vehicle in broad daylight on a main highway, the defendant had

demonstrated an "inattention to conditions in and about the road ahead of him" that caused his vehicle to strike and kill a pedestrian on the road on which the defendant was traveling. Id., 235. Our Supreme Court found such inattentiveness to be sufficient evidence of gross negligence.

The factual scenario before the trial court in this case leads to a similar conclusion. The defendant was traveling on a busy highway, during rush hour, at speeds estimated at sixty-five miles per hour. Having regained an awareness of his surroundings and having resumed driving in a customary manner, he did not immediately slow his vehicle or pull off the road. He continued to drive. His failure to appreciate, or his decision to ignore, such a substantial risk to others demonstrates more than ordinary negligence. An operator of a motor vehicle is always under a duty to exercise reasonable care; see *Clarke* v. *Connecticut Co.*, 83 Conn. 219, 224, 76 A. 523 (1910); and to keep a reasonable lookout for persons or traffic that he or she is likely to encounter. *Palombizio* v. *Murphy*, 146 Conn. 352, 357, 150 A.2d 825 (1959). If an operator of a motor vehicle encounters an impairment or distraction affecting his or her ability to exercise that duty of reasonable care, the disregard or failure to perceive the risk that he or she thereby creates by continuing to drive may surpass ordinary negligence. That is the case here. We conclude that the evidence sufficiently supported the court's conclusion that the defendant operated his vehicle with criminal negligence.

The judgment is affirmed.

In this opinion the other judges concurred.