### MARC PERUCCIO *v.* COMMISSIONER OF CORRECTION
### (AC 27923)

DiPentima, Gruendel and Robinson, Js.

Argued January 15—officially released April 15, 2008

*Christopher M. Neary*, special public defender, for the appellant (petitioner).

*Michael E. O'Hare*, supervisory assistant state's attorney, with whom, on the brief, were *James E. Thomas*, former state's attorney, *Angela R. Macchiarulo*, senior assistant state's attorney, and *Rosita M. Creamer*, former senior assistant state's attorney, for the appellee (respondent).

ROBINSON, J. The petitioner, Marc Peruccio, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly determined that he had received the effective assistance of counsel. We are not persuaded by the petitioner's arguments and, accordingly, affirm the judgment of the habeas court.

The following facts and procedural history are necessary for the resolution of the petitioner's appeal. On November 9, 1995, the jury found the petitioner guilty of manslaughter in the first degree and risk of injury to a child in connection with the death of a child who was approximately twelve months old. The trial court sentenced the petitioner to a total effective term of twenty years imprisonment. The petitioner directly appealed from his conviction through his trial counsel, Kimball Haines Hunt. This court affirmed the conviction, and our Supreme Court denied the petition for certification to appeal. See *State* v. *Peruccio*, 47 Conn. App. 188, 702 A.2d 1200 (1997), cert. denied, 243 Conn. 964, 707 A.2d 1266 (1998).

We previously determined that the jury reasonably could have found the following facts. "At approximately 8:40 p.m. [on September 2, 1993], a paramedic unit was dispatched to the victim's home to respond to a call concerning a baby who was not breathing. Upon arriving on the scene, the paramedic observed the victim on the floor with vomit in his mouth and the [petitioner] on the phone with 911 dispatchers who were attempting to instruct him on how to perform [cardiopulmonary resuscitation]. The victim had no pulse and was not breathing. He was taken by ambulance to Manchester Hospital and examined by Ronald D'Angelo, an emergency room physician. The [petitioner] told D'Angelo that the victim had choked while being fed, that his head

had rolled back, and that he had stopped breathing. In the emergency room, a bruise on the victim's forehead, a retinal hemorrhage and the dilation of one eye were observed. The victim's condition did not change and attempts to resuscitate the victim ceased at 11:12 p.m.

"Prior to going shopping on September 2, 1993, the victim's mother had arranged the victim's dirty clothing in various piles for laundering. At trial, the victim's mother testified that the piles of clothing had been moved. In particular, the police investigation discovered a shirt with blood stains lying on top of one of the piles. The victim's mother testified that at the time she went shopping, this shirt was inside a plastic bag next to the child's crib. The state police forensics laboratory was unable to determine the type of blood on the shirt. The laboratory did discover, however, that the victim's blood and the blood on the shirt both contained phosphoglucomutase one plus, indicating a possible match. In addition, the blood on the shirt was found to be mixed with saliva and epithelial cells, which line the mouth, throat, and digestive tract lining.

"At trial, D'Angelo testified that the victim's retinal hemorrhage was typical of the trauma associated with the shaking of a baby, but that trauma to the head of an infant can have the same effect as shaking. In addition, D'Angelo testified that the victim's retinal hemorrhage and the dilation of one of his pupils were indications of a brain injury that had progressed to a dangerous or emergent point.

"On September 3, 1993, Thomas Gilchrist, an associate medical examiner, performed an autopsy on the victim. He testified that the autopsy revealed that the victim was well nourished and without chronic illness, and that there were small abrasions on the forehead, a bruise on the left cheek, superficial lacerations on the inside of the mouth, and a small area of bleeding

due to a laceration under the upper lip. Gilchrist testified that due to an absence of scabs, in his opinion, the abrasions and lacerations were fresh. The autopsy also revealed a large number of hematomas, or accumulations of blood, located between the scalp and the skull and found on all sides of the victim's head, which Gilchrist concluded were inflicted shortly before the victim's death. In addition, the autopsy revealed small accumulations of blood between the dura, the thick membrane covering the brain, and the brain.

"Gilchrist concluded that the cause of death was blunt trauma to the head. He also testified that the specific mechanism of death was brain swelling, or cerebral edema, incident to the trauma. The trauma could have been caused by either direct blows to the victim's head or the striking of the victim's head against a fixed object. Gilchrist further testified that in his opinion the injuries to the victim's head were fresh. Although unable to determine the exact time of injury, he testified that in his experience, in the majority of cases, the blows resulting in cerebral edema occurred within the hour prior to the child's arrival at the hospital. In addition, he testified that vomiting of the gastric contents is a part of the dying process." Id., 192–94.

Following his unsuccessful appeal to this court, the petitioner filed a petition for a writ of habeas corpus, subsequently amended on October 27, 2005, alleging ineffective assistance of counsel. After hearing numerous days of testimony over the course of several months, the habeas court denied this petition. The court then granted the petition for certification to appeal from the denial of the petition for a writ of habeas corpus. Additional facts will be set forth as necessary.

As a preliminary matter, we identify the legal principles germane to the petitioner's appeal. "The principal purpose of the writ of habeas corpus is to serve as a

bulwark against convictions that violate fundamental fairness. . . . To mount a successful collateral attack on his conviction, a prisoner must demonstrate a miscarriage of justice or other prejudice and not merely an error which might entitle him to relief on appeal. . . . In order to demonstrate such a fundamental unfairness or miscarriage of justice, the petitioner should be required to show that he is burdened by an unreliable conviction." (Citations omitted; internal quotation marks omitted.) *Summerville* v. *Warden*, 229 Conn. 397, 419, 641 A.2d 1356 (1994). Additionally, we note that "[t]he right to counsel is not the right to perfect counsel." *Porter* v. *Commissioner of Correction*, 99 Conn. App. 77, 83, 912 A.2d 533, appeal dismissed, 284 Conn. 431, 934 A.2d 242 (2007); see also *Chace* v. *Bronson*, 19 Conn. App. 674, 678, 564 A.2d 303 ("[p]etitioners are entitled to reasonably professional assistance, not to perfect representation"), cert. denied, 213 Conn. 801, 567 A.2d 832 (1989).

We now set forth the standard for determining whether there has been ineffective assistance of counsel. "In *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court enunciated the two requirements that must be met before a petitioner is entitled to reversal of a conviction due to ineffective assistance of counsel. First, the [petitioner] must show that counsel's performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversarial process that renders the result unreliable. . . .

"The first part of the *Strickland* analysis requires the petitioner to establish that . . . counsel's representation fell below an objective standard of reasonableness considering all of the circumstances. . . . [A] court

must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .

"Turning to the prejudice component of the *Strickland* test, [i]t is not enough for the [petitioner] to show that the errors [made by counsel] had some conceivable effect on the outcome of the proceeding. . . . Rather, [the petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (Citations omitted; internal quotation marks omitted.) *Bova* v. *Commissioner of Correction*, 95 Conn. App. 129, 134–35, 894 A.2d 1067, cert. denied, 278 Conn. 920, 901 A.2d 43 (2006); see also *McColl* v. *Commissioner of Correction*, 101 Conn. App. 232, 235–36, 922 A.2d 180, cert. denied, 284 Conn. 902, 931 A.2d 264 (2007).

Finally, we set forth the applicable standard of review. "[I]n a habeas action in which the petitioner alleges ineffective assistance of trial counsel, the underlying historical facts found by the habeas court may not be disturbed unless they were clearly erroneous . . . . [M]ixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, [however] are not facts in this sense. . . . Whether the representation a defendant received . . . was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Hopkins* v. *Commissioner*

*of Correction*, 95 Conn. App. 670, 672–73, 899 A.2d 632, cert. denied, 279 Conn. 911, 902 A.2d 1071 (2006); see also *Grant* v. *Commissioner of Correction*, 86 Conn. App. 392, 397, 861 A.2d 1191 (2004), cert. denied, 273 Conn. 903, 868 A.2d 744 (2005).

The petitioner claims that the court improperly determined that he received the effective assistance of his trial counsel. He alleges that several instances of conduct by Hunt failed to satisfy the *Strickland* standard. He specifically argues that Hunt failed (1) to utilize the appropriate expert witness, (2) to attempt to limit the testimony of Gilchrist, (3) to object to Gilchrist's use of the word "blow" and (4) to introduce certain photographs of the victim into evidence. We will address each of those arguments in turn.

I

The petitioner first argues that Hunt provided him with the ineffective assistance of counsel by selecting the wrong expert. Specifically, he maintains that Hunt called Richard Simon, a neurosurgeon, to testify as a medical expert to refute the autopsy report and conclusions of Gilchrist. He further claims that Hunt should have utilized the services of a pathologist or a neuropathologist rather than a neurosurgeon. We conclude that the petitioner has failed to sustain his burden with respect to the prejudice prong of the *Strickland* standard and, accordingly, his argument must fail.[1]

The following additional facts are necessary for our discussion. At the petitioner's criminal trial, Gilchrist,

___

[1] Because we conclude that the petitioner has failed to satisfy the prejudice prong, we need not determine whether the alleged failure of his counsel constituted deficient representation. See *Varchetta* v. *Commissioner of Correction*, 104 Conn. App. 357, 360 n.6, 933 A.2d 1224, cert. denied, 285 Conn. 902, 938 A.2d 594 (2007). We note, however, that the habeas court specifically found that, with respect to the choice of expert witness, Hunt's performance was not constitutionally deficient.

a forensic pathologist, testified that he had performed an autopsy on the victim on September 3, 1993. His external examination revealed some abrasions and a bruise on the victim's face. He observed extensive areas of hematomas, or collections of blood, under the galeal, a thick membrane that lies between the skin and skull. These hematomas were confluent and present on all sides of the head. Gilchrist's further examination showed the presence of blood in both the subdural and subarachnoid areas. In Gilchrist's opinion, all of victim's injuries, both external and internal, appeared to be recent. He ultimately concluded that the victim's death was a homicide as a result of cerebral edema, or brain swelling, following a blunt trauma to the head. He further opined that the blunt trauma that caused the victim's death had occurred at the same time rather than over an extended period of time. Finally, he indicated that from the onset of the trauma to the head, there would have been a progressive diminishment of the victim's health.

Hunt presented Simon as an expert witness in response to the state's medical evidence. He selected Simon because he was the chief of neurosurgery at Hartford Hospital and the author of a medical book. Hunt also thought that, as a result of his practice, Simon would relate better to the jury as opposed to a pathologist who conducted autopsies.

Simon disputed the opinion that the injuries were imposed at the same time. Simon indicated that for blunt trauma to have been the cause of the victim's death, there were only two mechanisms by which this could have occurred. The first was vasospasm,[2] and there was nothing in the autopsy report to support or

---

[2] Simon testified that sometimes after a head trauma, the blood vessels around the brain go into spasm, tighten and constrict around the brain. As a result, the brain is starved of oxygen.

reject this possibility. The second was cerebral edema, and Simon indicated that, in his opinion, the findings in the autopsy report did not support this mechanism. Simon ultimately concluded that, on the basis of the autopsy report, he could not state with a reasonable degree of medical probability what the cause of death was.

During the habeas proceedings, the petitioner presented Jan Edward Leestma, a neuropathologist, as a witness.[3] He distinguished the medical specialties of neurosurgery versus neuropathology.[4] He indicated that he had reviewed the autopsy report, autopsy photographs, tissue slides, hospital medical records and the transcript of Gilchrist's trial testimony. Leestma offered several criticisms regarding both the manner in which Gilchrist had conducted the autopsy and his subsequent findings.[5] Although he could not eliminate the possibility that the injury causing the bleeding in the victim's

[3] The habeas court described Leestma as "a highly qualified and well respected neuropathologist."

[4] Specifically, Leestma testified: "Neurosurgeons are physicians, of course. They are treating physicians. That means that they have pursued a course of education and training that enables them to diagnose and treat nervous system diseases, and if you're a surgeon, it usually means you're—part of your treatment would be some operative intervention, whether it's a brain tumor, you take it out; if it's a blood clot or something, they may take it out. There's some direct intervention often involved in that. That training program that they go through is directed at diagnosis and treatment and taking care of people directly.

"The discipline of neuropathology, on the other hand, is a broad study of diseases of the nervous system, how they work, what they look like, what the time course and natural history of the disease is, and it does not usually directly involve diagnosis and treatment. Of course, it's diagnosis, but it doesn't involve hands-on treatment with patients or interventions of that sort. We act primarily as consultants and background support people for clinicians such as neurosurgeons."

[5] Leestma opined that Gilchrist should have made a slide of the dura or collected a sample of the dura, because he suspected a head injury, and sent it to a consulting neuropathologist and that the failure to do so constituted a departure from the standard of practice. He also stated that Gilchrist had failed to report a thickening of the pleura, the outer lining of the lung, indicating pronounced scarring. Finally, Leestma indicated that Gilchrist

brain had occurred within two hours of death, Leestma opined that such an injury had occurred at an earlier time.

Harold Wayne Carver II, the chief medical examiner, disputed certain aspects of Leestma's testimony.[6] The respondent, the commissioner of correction, also presented testimony from Dean Uphoff, a neuropathologist who had examined the victim's brain. Both Carver and Uphoff concluded that the victim died within hours of sustaining a traumatic injury to the head.

We are mindful that, under certain circumstances, the failure to use *any* expert can result in a determination that a criminal defendant was denied the effective assistance of counsel. *Siano* v. *Warden*, 31 Conn. App. 94, 99–105, 623 A.2d 1035 (failure to call orthopedic surgeon who would have testified that due to extensive injuries, it would have been difficult for petitioner to carry heavy computer equipment from residence constituted inadequate assistance of counsel), cert. denied, 226 Conn. 910, 628 A.2d 984 (1993); see also *Bell* v. *Miller*, 500 F.3d 149 (2d Cir. 2007) (failure to present expert testimony regarding effects of trauma, significant blood loss and certain medication on memory of witness constituted ineffective assistance); *Lindstadt* v. *Keane*, 239 F.3d 191 (2d Cir. 2001) (failure to consult expert on sexual abuse of children constituted inadequate assistance).[7] The present case, however, is not

had not mentioned the unusual presence in the liver of tissue that makes red and white blood cells.

[6] For example, Carver indicated that the decision of whether to retain the dura was left to the pathologist conducting the autopsy and that the pleura appeared normal to him. Carver also testified that some pathologists would not document the fact that red blood cells were being produced outside of the liver.

[7] The United States Court of Appeals for the Second Circuit has stated: "[T]here is no *per se* rule that requires trial attorneys to seek out any expert." (Emphasis in original; internal quotation marks omitted.) *Gersten* v. *Senkowski*, 426 F.3d 588, 609 (2d Cir. 2005), cert. denied sub nom. *Artus* v. *Gersten*, 547 U.S. 1191, 126 S. Ct. 2882, 165 L. Ed. 2d 894 (2006).

such a situation. Instead, the issue is whether Hunt chose, in the words of the petitioner, the "wrong" expert and, as a result, rendered ineffective assistance.

Even if we were to assume arguendo that Hunt's selection of a neurosurgeon as an expert witness to testify at the criminal trial constituted deficient performance, no prejudice resulted from that deficiency. On the basis of our review of the record, we conclude that the petitioner has failed to demonstrate that there is a reasonable probability that if Hunt had called a pathologist or a neuropathologist as an expert witness during the criminal trial, the jury would have had a reasonable doubt of the petitioner's guilt. First, we note that Hunt, through the use of Simon's testimony, did present a significant assault on the testimony of Gilchrist. We agree with the statement of the habeas court that Hunt "did mount a spirited attack through the use of . . . Simon." This is not a case in which defense counsel failed to challenge the state's theory of criminal liability. Cf. *Siano* v. *Warden*, supra, 31 Conn. App. 99–105. Instead, Hunt aggressively and zealously challenged the conclusions of Gilchrist through the use of Simon, and the jury was forced to resolve the disparate opinions of these two experts. In other words, the jury had been presented with substantial attacks on the state's expert, which is precisely what Leestma would have done. Although Leestma possibly may have been a "better" expert witness than Simon,[8] we conclude that the petitioner has not established a reasonable probability that had Leestma testified, the result would have been different.

[8] The United States Court of Appeals for the Fourth Circuit has stated: "The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness. To entertain such claims would immerse federal judges in an endless battle of the experts . . . ." *Wilson* v. *Green*, 155 F.3d 396, 401 (4th Cir.), cert. denied sub nom. *Wilson* v. *Taylor*, 525 U.S. 1012, 119 S. Ct. 536, 142 L. Ed. 2d 441 (1998).

Furthermore, we note the existence of substantial evidence upon which the jury found the petitioner guilty. "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. . . . [A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." (Internal quotation marks omitted.) *Nieves* v. *Commissioner of Correction*, 51 Conn. App. 615, 621, 724 A.2d 508, cert. denied, 248 Conn. 905, 731 A.2d 309 (1999).

In the petitioner's direct appeal, we observed: "The evidence was sufficient for the jury to find that the [petitioner] had the opportunity to commit the crime during the time when the child was in his exclusive care. The jury also had sufficient evidence before it to find that on September 2, 1993, when the mother left the child in the care of the [petitioner], the child was a normal, healthy one year old without bruises, scratches, or any other abnormalities that might lead to death, that the child's injuries were not caused accidentally, and that the child's injuries resulting in his death occurred during the time when he was in the exclusive control of the [petitioner] and were caused by the [the petitioner]." *State* v. *Peruccio*, supra, 47 Conn. App. 195. There were two prior instances of the victim sustaining injuries while in the petitioner's care. The first was a burned finger and the second was a bloody lip. Id., 190. On the day before the victim died, his pediatrician performed a scheduled physical examination of the victim and found no abnormalities. Id.,

191. No one who had taken care of the victim on the day he died had observed a bruise on his forehead; however, personnel in the emergency department of the hospital had noticed such a mark during their attempts to resuscitate the victim.[9] Police investigators found a shirt stained with blood and cells that line the mouth and digestive tract. Id., 192. The victim's mother testified that piles of the victim's clothing had been moved after she left and that a shirt with bloodstains had been in a plastic bag next to the child's crib. Id. Finally, Leestma, the petitioner's expert, admitted that the victim could have sustained the trauma within two hours of death. In other words, he did not opine that the fatal injury could not have occurred within the time period that the victim was in the sole care and custody of the petitioner.

We recently have stated: "The second part of the *Strickland* analysis requires more than a showing that the errors made by counsel may have had some effect on the outcome of the proceeding. . . . Rather, [the petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (Citation omitted; internal quotation marks omitted.) *Porter* v. *Commissioner of Correction*, supra, 99 Conn. App. 83. Meeting this admittedly high standard is indeed a "herculean

---

[9] Prior to the arrival of the ambulance, a neighbor observed the petitioner holding the victim. The neighbor noticed that the victim was making noises and sounded sick. She offered to give the petitioner some Tylenol for the victim. The petitioner declined and took the victim back to the apartment. This description of the child was consistent with Gilchrist's testimony that following a severe trauma to the head, a child would become lackadaisical and lethargic and enter into a progressive pattern of lethargy, semicoma, coma and, eventually, death.

task . . . ." (Internal quotation marks omitted.) *Denby* v. *Commissioner of Correction*, 66 Conn. App. 809, 813, 786 A.2d 442 (2001), cert. denied, 259 Conn. 908, 789 A.2d 994 (2002). On the basis of our review of the entire record, we conclude that the petitioner has failed to establish prejudice as a result of Hunt's decision to present a neurosurgeon as an expert witness, and, therefore, his claim on appeal must fail.

## II

The petitioner next argues that he received ineffective assistance of counsel as a result of Hunt's failure to attempt to limit the testimony of Gilchrist, either by a motion in limine or a motion to strike. He further maintains that because Gilchrist relied in part on a report from a neuropathologist, Gilchrist was not qualified to offer an opinion as to the cause of death. We are not persuaded.

The following additional facts are necessary for our discussion. During the criminal trial, Gilchrist discussed his educational background and experience as a forensic pathologist. He further testified that he had performed the autopsy of the victim and discovered numerous recent injuries. Specifically, Gilchrist stated that he had noted six categories that supported his diagnosis of blunt trauma to the head.[10] On the basis of his experience and examination, he concluded that the victim had died from cerebral edema as a result of blunt trauma to the head.

Following the autopsy, Gilchrist produced a report. Included with Gilchrist's report were two addenda. The first was a report by the consulting neuropathologist, Uphoff. The second was a toxicology report completed

[10] Gilchrist had observed a diffuse patch subarachnoid hemorrhage with small subdural hematoma, cerebral edema, multiple subgaleal hematomas, abrasions and contusion of the face, small superficial lacerations of the inside of the mouth and small, fresh retinal hemorrhages.

by Richard D. Pinder, the director of the state toxicology laboratory. The petitioner claims that, under these circumstances, had Hunt objected, he would have been able to limit, or possibly even exclude Gilchrist's testimony and conclusions regarding edema and the mechanism of the victim's death.

After thoroughly reviewing the record, we disagree with the petitioner's claim that Hunt would have been able to limit or strike Gilchrist's testimony at the criminal trial. Gilchrist clearly was qualified, on the basis of his educational background and his examinations of the victim, to testify as to the cause of death. "In order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." *State* v. *Asherman*, 193 Conn. 695, 716, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Although his conclusions certainly were subject to challenge by other experts, we cannot conclude that Gilchrist's testimony could have been excluded in the present case.

The petitioner has failed to prove that if Hunt had filed a motion in limine or a motion to strike with respect to Gilchrist's testimony, there would have been a reasonable probability that such a motion would have been granted. See *Correa* v. *Commissioner of Correction*, 101 Conn. App. 554, 556, 922 A.2d 289, cert. denied, 283 Conn. 911, 928 A.2d 536 (2007). Furthermore, as we explained in part II A, the state presented significant evidence of the petitioner's guilt outside of Gilchrist's testimony.[11] We conclude, therefore, that the petitioner has failed to establish that he was prejudiced by Hunt's decision not to move to limit or to strike Gilchrist's testimony.

---

[11] We also note that Hunt was able to use Gilchrist's unfamiliarity with some of the statements in the consulting neuropathologist's report to attack his credibility before the jury.

## III

The petitioner next argues that he received ineffective assistance of counsel as a result of Hunt's failure to object to Gilchrist's use of the word "blow" during his testimony. Specifically, he contends that the use of "blow" was prejudicial because it has a pejorative connotation that a third party must have been involved with the blunt trauma to the victim's head, as opposed to the victim's head striking a fixed object, such as a floor. We are not persuaded.

The following additional facts are necessary for our discussion. At the criminal trial, Gilchrist stated that he could not determine whether the trauma had been caused by blows to the victim's head or the head striking a fixed object. On several occasions during his testimony at the criminal trial, Gilchrist used the word "blow" when describing the injuries suffered by the victim. At the habeas trial, Leestma indicated that the word "blow" means the wielding of some object or the use of one's fist itself to strike a static head. In contrast, "fall" means a moving head coming into contact with a stationary impact site. Leestma stated that "to equate blows and falls kind of runs roughshod over some important biomechanical differences. . . . [B]lows tend to produce surface injury, local injury, and not subdurals and not deep brain injury. Falls tend to do just the opposite . . . ." Leestma then concluded that Gilchrist inappropriately had misused the term "blow."

First, we note that the jury was not presented with the definition used by Leestma with respect to the word "blow." There is nothing in the record to suggest that the jury was aware of the specific distinction used in the field of pathology. The petitioner insists that "blow" contains a pejorative meaning. We are not persuaded by this mere speculation on the part of the petitioner.

Second, we conclude that the petitioner has failed to establish that he was prejudiced by Hunt's decision not to object to Gilchrist's use of "blow." As we previously have concluded, there was substantial evidence to support the jury's finding of guilt. As to this specific claim, the petitioner has failed to establish that had Hunt objected to the use of the word "blow," there is a reasonable probability that the result of the proceeding would have been different.

## IV

The petitioner finally argues that he received ineffective assistance of counsel as a result of Hunt's failure to introduce into evidence certain photographs of the victim. The respondent counters that this decision constituted a matter of trial strategy and tactics, and, therefore, the petitioner cannot demonstrate that his right to effective counsel was violated. We agree with the respondent.

In his operative petition, the petitioner alleged that "Hunt failed to require the State to disclose and produce in evidence additional photographs of the child victim that would have visually established that the injuries to the child's face were likely caused by the efforts by emergency personnel to resuscitate him. This inaction left in evidence only the photographs entered by the State—photographs that likely left the finder of fact with an erroneous inference of abuse by the petitioner."

The court permitted the petitioner to introduce a deposition of Hunt into evidence.[12] During his deposition, Hunt was asked if he had offered all of the photographs of the victim that showed bruising on the victim's face as a result of medical efforts to resuscitate. Hunt responded that he did not want to introduce the photographs into evidence because he believed them to be prejudicial and described them as "garish."

---

[12] Hunt also testified during the habeas trial.

It is clear from the record that Hunt's decision to not introduce these photographs was a matter of trial strategy. Hunt did not want the members of the jury to see additional photographs of the victim, a small child. "It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Henderson* v. *Commissioner of Correction*, 104 Conn. App. 557, 571–72, 935 A.2d 162 (2007), cert. denied, 285 Conn. 911, 943 A.2d 470 (2008); *Brown* v. *Commissioner of Correction*, 92 Conn. App. 382, 385, 885 A.2d 761 (2005), appeal dismissed, 281 Conn. 466, 915 A.2d 870 (2007).

Simply put, the decision by Hunt not to introduce the photographs falls into the category of trial strategy or judgment calls that we consistently have declined to second guess. See *Lewis* v. *Commissioner of Correction*, 89 Conn. App. 850, 868, 877 A.2d 11, cert. denied, 275 Conn. 905, 882 A.2d 672 (2005); see also *Grant* v. *Commissioner of Correction*, supra, 86 Conn. App. 399.

Accordingly, this claim of ineffective assistance of counsel must fail.

The judgment is affirmed.

In this opinion the other judges concurred.