******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DAVID P.* *v.* COMMISSIONER OF CORRECTION
(AC 36936)

Beach, Alvord and Norcott, Js.

*Argued January 12—officially released August 9, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Bright, J.)

*Heather Clark*, assigned counsel, for the appellant
(petitioner).

*Lisa A. Riggione*, senior assistant state's attorney,
with whom, on the brief, were *Michael Dearington*,
state's attorney, and *David Clifton*, assistant state's
attorney, for the appellee (respondent).

*Opinion*

NORCOTT, J. The petitioner, David P., appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus.[1] On appeal, the petitioner claims that the habeas court erred by concluding that habeas counsel for the petitioner in his first habeas trial provided effective assistance. Specifically, the petitioner claimed that his first habeas counsel was ineffective because he failed to investigate and raise claims that criminal trial counsel provided ineffective assistance when he (1) failed to offer witnesses who would have supported a defense theory that the investigation violated best practices, consistent with the interviewers' exerting social pressure and influence on the victims; and (2) mischaracterized testimony of the underlying allegations and elicited additional allegations. The petitioner further claims that the habeas court erred by overruling the petitioner's objection, raised during the habeas trial, to testimony regarding statements made by one of the child victims to Alphonse Gambardella, a worker with the Department of Children and Families (department), because the statements were hearsay and not within any exception. We disagree that habeas counsel in the petitioner's first habeas trial rendered ineffective assistance. Although we agree with the petitioner that Gambardella's testimony was hearsay not within any exception, we conclude that its admission was harmless error. Accordingly, we affirm the judgment.

This appeal is the most recent in a series of challenges to the petitioner's conviction, in 2000, of a total of five counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1), and five counts of risk of injury to a child in violation of General Statutes § 53-21. These convictions arose from the petitioner's prolonged sexual abuse of three of his daughters, herein referred to as A, B, and C.[2] See *State* v. *David P.*, 70 Conn. App. 462, 464–66, 800 A.2d 541, cert. denied, 262 Conn. 907, 810 A.2d 275 (2002). The petitioner ultimately received two trials, the first of which ended in a mistrial on September 30, 1998, and the second of which resulted in these convictions on March 30, 2000. After the petitioner was convicted, on May 19, 2000, he was sentenced to ninety years imprisonment.

From this judgment, the petitioner took an appeal, in which he raised several challenges to his convictions not relevant to those before us now. See id., 464. This court affirmed the judgment. Id. In 2002, the petitioner filed his first petition seeking a writ of habeas corpus. In his amended petition and at trial in 2004, he alleged that trial counsel was ineffective in that he failed to obtain and offer evidence—specifically, time sheets from his own employers and his former wife's

employer—that would have helped to establish an alibi defense. He also alleged that his appellate counsel was ineffective for failing to brief properly and to raise certain claims that were unrelated to the claims in the present appeal. After trial, the court dismissed the habeas petition. The petitioner appealed from this dismissal, his appellate counsel withdrew, and the appeal was dismissed for lack of diligence.

On June 14, 2013, the petitioner filed the operative amended habeas petition in the present case. In his petition, the petitioner raised, inter alia, the two claims of ineffective assistance of counsel that he now pursues on appeal. Following a trial on November 25 through 27, 2013, the court, *Bright*, *J.*, denied the petition for a writ of habeas corpus on May 19, 2014, and granted certification to appeal on May 27, 2014. Further procedural history and facts will be set forth as necessary.

I

The petitioner claims that his habeas counsel in his first habeas trial, Joseph Visone, rendered ineffective assistance. Specifically, the petitioner claims that Attorney Visone was ineffective because he failed to investigate and raise a claim that trial counsel, William Palmieri, rendered ineffective assistance when Palmieri failed to present, in the petitioner's second trial, a defense theory that the investigation violated best practices because the investigators suggested the victims' answers to questions. The petitioner further challenged as clearly erroneous the habeas court's findings that (1) trial counsel had a reasonable expectation that he would be able to present evidence important to his theory; (2) Dr. David Mantell, a forensic psychologist who testified as an expert for the petitioner in this matter, had only minor issues with respect to the interviews of two of the victims; and (3) there was a risk that if Palmieri had raised the alternative defense, Gambardella and certain other constancy witnesses at the second trial could have given damaging testimony. The respondent, the Commissioner of Correction, counters that these findings were supported by the record. The respondent further argues that the habeas court properly concluded that Palmieri was not ineffective for deciding to pursue a peer pressure defense instead of a suggestive investigation defense, and that Attorney Visone, therefore, was not ineffective for failing to raise the claim of ineffective assistance of trial counsel in the first habeas action. We agree with the respondent.

The following additional facts and procedural history are relevant to our discussion of this claim. The habeas court found that Palmieri's theory of defense was that (1) the allegations of A, B and C were false and arose from social pressure exerted by A's friends, K and H, who were angry with the petitioner because he would not allow A to see them; (2) B fabricated her allegations

in an effort to corroborate A's allegations; and (3) the allegations of C were simply not credible. Palmieri further argued at trial that there was little physical evidence of abuse of A, and none of B or C. At the first criminal trial, Palmieri supported his theory by arguing that the evidence showed that K and H falsely reported the abuse to the department six months before A's initial disclosure, and that K reported the abuse to a social worker at A's school, attended the meeting with the social worker, and did most of the talking during that meeting, with A merely agreeing with K's descriptions of the alleged sexual abuse.

The habeas court further found that the court, *Licari, J.*, declared a mistrial on all counts, except one, in the petitioner's first criminal trial on September 30, 1998, because the jury deadlocked on all but the one count. The jury did, however, acquit the petitioner of one of the counts of sexual assault in the first degree involving A.

The habeas court found that Palmieri used the same theory of defense in the second criminal trial, in March, 2000, as in the first. In the second criminal trial, however, defense counsel encountered setbacks that did not arise in the first trial: for example, the state objected to evidence that was admitted in the first trial regarding the motive of H and K for filing a report with the department. The court, *Fracasse, J.*, sustained this objection, ruling that the evidence was irrelevant. Further hindering the defense's theory, H and K denied any recollection of whether A had reported anything to them, and of whether they discussed anything with the department. In addition to these challenges, in the second criminal trial, the state presented two constancy of accusation witnesses, L and D, neither of whom testified at the first criminal trial. L, A's classmate, testified that A reported the petitioner's sexual abuse to her six months before H and K made their initial report to the department, and D, L's mother, testified that L had relayed this information to her around the time A told L.

In the habeas trial that is the subject of this appeal, counsel for the petitioner presented evidence of a different theory of defense, a theory that the petitioner claimed was unreasonably not pursued by defense counsel in the petitioner's second criminal trial. This alternative theory was that, rather than being fabrications produced under pressure from K and H, the allegations of the three sisters were suggested to them by the manner in which the investigation was conducted. In particular, the petitioner took issue with the interviews in which the sisters made their disclosures. He claimed that the interviews were suggestive because they were lengthy, repeated, and attended by numerous authority figures, and that Palmieri performed deficiently by not calling as witnesses those persons who were present for the interviews but had not been called by the state, by not more thoroughly examining those

witnesses involved in these interviews who did testify, and by failing to obtain certain medical, psychological, and educational records that would have substantiated how the interviews took place.

The habeas court's factual findings with respect to the petitioner's claim regarding this alternative theory of defense centered on the testimony and other evidence presented by and through several individuals who were involved in the interviews of the three sisters, and also upon the testimony of the petitioner's expert witness, Mantell, a licensed psychologist specializing, inter alia, in child abuse and neglect and forensic psychology.

The habeas court found, from the testimony of Elizabeth DeLancy, a school psychologist, and A, that DeLancy first learned of the abuse from A's friend, K. On May 12, 1997, K came to DeLancy's office with A, whereupon, according to DeLancy, K did most of the talking. K would provide details of the abuse, DeLancy would ask A if this was true, and A would simply respond "yes." DeLancy testified that A did describe on her own when and where the last instance of abuse had occurred. By contrast, A testified that K did all of the talking in the May 12 meeting with DeLancy, and that A initially denied the abuse. The habeas court found that DeLancy's notarized statement of May 15, which memorialized these events, corroborated DeLancy's testimony about them.

The habeas court also summarized DeLancy's May 13, 1997 meeting with A, in which A initially denied any abuse, but then, in response to DeLancy's insistence that she tell the truth, disclosed that her father, the petitioner, was having sex with her. DeLancy testified that K was present for this interview. DeLancy also testified that at the end of the interview, she told A that she would need to disclose to the police and the department, and that doing so would stop the abuse. DeLancy's aforementioned notarized statement, however, differed from her testimony about the May 13 meeting in that DeLancy recorded that she asked A about specific sexual acts rather than asking A to describe the acts that the petitioner had done. According to the statement, A also wrote down on a piece of paper, "My father is having sex with me." The statement also indicates that DeLancy brought K into the room for "emotional support" for A, although K was instructed not to answer any questions. Finally, DeLancy reported in her statement that she told A that she would have to be brave when meeting with the police and the department, that she was doing the right thing, and that she was a "good kid."

Again on May 13, 1997, A was interviewed, this time by DeLancy, Gambardella, the principal of A's school, and Anthony Natale, a detective with the Hamden Police Department, together, for ninety minutes. Natale testi-

fied that he told A at the beginning of the interview that she had not done anything wrong and did not need to be afraid to speak freely. He also testified both at the petitioner's criminal trial and in the habeas trial that A had disclosed during the interview that the abuse had been occurring for about one and one-half years. Gambardella testified in the habeas trial that after Natale left, A asked to speak to him alone and told him, "I know what sex is. My dad is having sex with me."

The habeas court found that Gambardella then interviewed each of A's three sisters[3] individually, with DeLancy present, and both B and C each testified at the petitioner's criminal trials that they had denied to Gambardella any abuse by the petitioner.

Again, on May 13, for one hour, Donald Remillard, another detective with the Hamden Police Department, interviewed A. On May 21, 1997, Janet Murphy, a nurse practitioner, interviewed A alone at the Yale-New Haven Hospital Child Sexual Abuse Clinic (clinic) about the allegations as part of a medical examination for physical evidence of sexual abuse. On June 10, 1997, Florence Freudenthal, who worked at the clinic, interviewed A again.

B also underwent several interviews. After A's May 12 and 13 disclosures, she and her sisters were referred to the Coordinated Council for Children in Crisis (4C) for counseling sessions with Diane Brinkman. On June 4, 1997, during one such session, while Brinkman and B were alone, B disclosed that the petitioner had sexually abused her on two occasions. Brinkman reported this disclosure.

On June 5, 1997, Natale and Gambardella interviewed B with her mother present. While there, Gambardella also spoke to B's sisters. C did not disclose any abuse at that time. On June 11, 1997, Freudenthal interviewed B at the clinic, with no one else present. Murphy took a medical history from B, alone, before examining her. On June 24, 1997, Brinkman spoke alone with B, who had brought her sister C with her to 4C. Brinkman then spoke with C, who disclosed for the first time that the petitioner had sexually abused her in the past in her parents' bedroom. Brinkman did not question C further at that time about the allegations, but counseled her and then reported C's disclosure to the department and the police.

On July 2, 1997, C then also underwent an interview and a medical examination. Freudenthal conducted the interview in the same fashion as with A and B, alone. Murphy then conducted a physical examination of C.

To evaluate this process, the petitioner presented an expert witness, Mantell. He testified that, at least since 1987, there has been an understanding of best practices to be followed when interviewing children about alleged sexual abuse, and, after describing those practices, he

opined that they had been violated in various ways during the interviews of A, B, and C.

Mantell opined that best practices were violated in numerous respects during interviews of A. First, he took issue with the fact that DeLancy interviewed A at all, rather than simply reporting the abuse and then waiting for others to determine how to proceed. Second, Mantell criticized how these interviews were conducted, particularly K's involvement. According to Mantell, K's presence, and the process of K doing most of the talking and A merely affirming K's statements, created the possibility that A's responses were either coached by or entirely the product of K's suggestions, rather than A's memory. K's presence also put pressure on A to confirm her friend's account. Third, Mantell suggested that DeLancy coaxed and validated the allegations by urging A to tell the truth after she initially denied abuse, and then by telling her to be brave and that only through disclosure of abuse could her father get help.

Mantell also criticized the subsequent interviews of A, finding fault with the presence of multiple people in the interview room—especially DeLancy, whose presence could have pressured A to keep her story consistent with what she previously said to DeLancy rather than to tell the truth. Mantell also criticized the lengthy duration and repetition of the interviews, opining that both could have hardened A's belief in the events she described, even if they never happened.

Mantell also opined that best practices were violated during interviews of B. Mantell opined that the three girls should have been separated during the period prior to their May 13 interviews—although the habeas court found that they were, in fact, interviewed separately— to avoid cross-contamination between their stories in the interviews. Regarding the June 5 interview, Mantell again criticized the presence of multiple individuals and the fact that B was asked what she had disclosed to Brinkman, rather than simply being asked what had happened.

Mantell repeated his criticisms of A's and B's interviews when he opined that best practices were violated as well during the interviews of C. He added that in C's interview at the clinic, best practices had been violated by having two people present, especially because one of them was Brinkman, to whom C had previously disclosed and to whom it would therefore have been harder subsequently to deny abuse.

Finally, Mantell criticized the police and the department for not testing alternative theories, including whether A had been influenced by K to fabricate her complaint, as well as both entities' failure to check the source of the girls' knowledge by questioning it.

The habeas court found Mantell's testimony as to A

to be "logical and well-supported," although the court was less firm in this conclusion regarding B's and C's interviews. It held that the theory of defense offered by the petitioner would have been a reasonable defense to present at the petitioner's second criminal trial. The habeas court further concluded, however, that Palmieri's failure to pursue this defense was not objectively unreasonable, and in turn, that Attorney Visone's decision not to challenge Palmieri's failure was also not objectively unreasonable.

In reaching these conclusions, the habeas court noted several serious vulnerabilities of the defense advocated by habeas counsel. First, the suggestive interview defense would have left unexplained the damaging testimony of two witnesses, L and D, each of whom testified to learning of A's abuse almost a year before DeLancy conducted the first interview of A on May 12, 1997. The habeas court found that neither witness was involved in A's disclosure to DeLancy.

Second, the suggestive interview defense was not consistent with the pattern of the girls' disclosures in that if B's and C's interviews were suggestive by virtue of A's presence, one would have expected them to disclose abuse by the petitioner at those times, but in fact, each denied it. Furthermore, B and C each later disclosed abuse to Brinkman. In those interviews, she was alone with each girl and made no attempt to elicit details from either of them, suggesting that she followed Mantell's best practices. Indeed, the habeas court characterized Mantell's issues with B's and C's interviews as "minor."

Third, there was little evidence to establish the suggestive interview defense with respect to later interviews of B and C. Though Natale and Gambardella's interview of B was recorded and transcribed verbatim, the habeas court could find nothing suggestive in it. Other than Mantell's criticism that Brinkman was present for C's interview, there was no evidence to show that her interview at the office of Clifford Beers was suggestive, either. The habeas court further noted that, given the weaknesses of the defense as it could apply to B and C, the jury could have been skeptical about applying the suggestive interview defense to A as well.

Fourth, the suggestive interview defense would have resulted in the jury's hearing certain damaging testimony that it did not otherwise hear from various witnesses. For example, Gambardella, who did not testify in the petitioner's second criminal trial, testified in the habeas trial that A specifically asked to speak to him one-on-one, and that when she did so, she told him unprompted that she knew what sex was and that her father was having sex with her. This testimony would have undermined the argument that A was pressured to disclose by the presence of multiple interviewers, and would also have served as constancy testimony to

corroborate A's allegations. Freudenthal, whose notes the habeas court deemed "mostly compliant" with Mantell's view of best practices, could also have testified as a constancy witness—as she otherwise could not have because her interviews were after the girls disclosed their abuse to the police. Furthermore, in the petitioner's second criminal trial, Palmieri successfully precluded DeLancy from discussing the details of the abuse disclosed by A, but if he had argued that DeLancy's interview was suggestive and tainted the subsequent investigation, DeLancy would have had to describe at least some of the details of what A disclosed in order to show which specific acts K had described, and suggestive questions DeLancy had asked.

We begin with our standard of review for the habeas court's findings and conclusions. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Williams* v. *Commissioner of Correction*, 142 Conn. App. 744, 752, 68 A.3d 111 (2013).

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . When a [petitioner] complains of the ineffectiveness of counsel's assistance, the [petitioner] must show that counsel's representation fell below an objective standard of reasonableness. *Strickland* v. *Washington*, 466 U.S. 668, 687–88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A [petitioner's] claim that counsel's assistance was so defective as to require a reversal of the conviction . . . has two components. First, the [petitioner] must show that counsel's performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . *Smith* v. *Commissioner of Correction*, 141 Conn. App. 626, 632, 62 A.3d 554 (2013)." (Citations omitted; internal quotation marks omitted.) *Williams* v. *Commissioner of Correction*, supra, 142 Conn. App. 752.

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment

of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (Citations omitted; internal quotation marks omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 689–90.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id., 690–91.

With these legal standards in mind, we turn to the petitioner's claim. Preliminarily, the petitioner challenges several factual findings of the habeas court. He claims that the court's findings that trial counsel had a reasonable expectation that he would be able to present evidence important to his theory and that Mantell had "only minor issues" regarding the conduct of B's and C's interviews were clearly erroneous.

"The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed [on appeal] unless they are clearly erroneous. . . . Thus, [t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . Thus, the court's factual findings are entitled to great weight. . . . Furthermore, [a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Orcutt* v. *Commissioner of Correction*, 284 Conn. 724, 741–42, 937 A.2d 656 (2007).

None of the petitioner's challenges to the factual findings have merit. The record and memorandum of decision reflect that the petitioner was tried twice. Palmieri thus had the opportunity to test the effectiveness of the evidence upon which he based his theory of defense, which rehearsal, by itself, provides record evidence to support the habeas court's finding. The petitioner's challenge to the habeas court's finding that Mantell had "only minor issues" regarding B's and C's interviews is similarly unfounded; Mantell testified only briefly about the issues with the interviews of each girl, and discussed the issues in a relatively cursory fashion and in considerably less depth than he did for A's interviews. There was evidence to support the habeas court's finding that Mantell's issues with these interviews were minor, and its finding to that effect was not clearly erroneous.

Turning to the main substance of the petitioner's claim, that the habeas court improperly concluded that Palmieri's decision not to pursue a suggestive interview defense constituted ineffective assistance of counsel, we are similarly not persuaded. In its thorough and well reasoned opinion, the habeas court recounted the numerous pitfalls along the road not taken, which we have summarized previously in this opinion. As discussed in more detail previously, the suggestive interview defense would have left unexplained, and not been consistent with, the testimony of L and D, to whom A disclosed almost a year before she disclosed to DeLancy, and neither of whom was involved in A's disclosure to DeLancy. Furthermore, if the interviews had been suggestive, one would have expected A's presence to pressure the other two girls to disclose during their interviews while A was there, but in fact, they did not do so at that time. Both girls also had subsequent interviews with Brinkman which, in the habeas court's estimation, complied with Mantell's described best practices. Finally, as noted previously, pursuing a suggestive interview defense likely would have resulted in the jury hearing certain damaging testimony from constancy of accusation witnesses, including from Gambardella, who A spoke with alone and told unprompted that her father was having sex with her.

The petitioner has not "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 689. Examining the situation from Palmieri's perspective before the second criminal trial, pursuing the strategy of the first trial—that the allegations of sexual abuse were false and were the product of the influence of A's friends—did not fall below an objective standard of reasonableness. See id., 688. Palmieri's choice of strategy at the outset of the second trial was not unreasonable. He had marshaled evidence to support a theory that the allegations were false, including

evidence that as early as December, 1996, H and K were making unfounded complaints to the department regarding the petitioner. He intended to argue to the jury that these earlier complaints, in conjunction with K's extensive participation in A's initial interview with DeLancy, led to A's fabrication, which B and C corroborated with their own so that others would believe A.

The petitioner nonetheless argued that however reasonable it was for Palmieri to pursue this strategy in the first trial, he was deficient for having done so in the second, because he had lost the element of surprise and therefore should have anticipated that the state would be ready to counter the same defense. In support of this argument, the petitioner points out that the state successfully persuaded the court to preclude much of the evidence regarding H's and K's complaints that Palmieri used in the first trial. The petitioner further observes that the victims were better witnesses in the second trial than in the first.

We are not persuaded. The fact that the court made these rulings during trial does not mean that Palmieri reasonably should have anticipated them at the outset. Indeed, recalling the first trial, in which the evidence precluded in the second trial was admitted, Palmieri could reasonably have expected similar rulings. The petitioner also had available the transcripts of the first trial to control or impeach witnesses who testified differently than they had in the first trial.

In his appellate brief, the petitioner relies heavily upon cases that discuss trial counsel's failure to call expert witnesses in sexual assault cases. See, e.g., *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 100–101, 52 A.3d 655 (2012); *Peruccio* v. *Commissioner of Correction*, 107 Conn. App. 66, 76, 943 A2d 1148 (2008); *Lindstadt* v. *Keane*, 239 F.3d 191 (2d Cir. 2001). The petitioner's reliance is misplaced, however, because these cases merely make the point that "in certain instances, the employment of an expert for the defense may be constitutionally mandated by the facts and surrounding circumstances of the case . . . ." *Michael T.* v. *Commissioner of Correction*, supra, 101. Moreover, in *Michael T.*, the expert witness in issue was found *not* to be constitutionally required. Id. Under the facts of this trial, however, an expert likely would have provided testimony substantially similar to that given by Mantell in the habeas trial, and even with such expert testimony, the theory of defense still would have been vulnerable to the same weaknesses described by the habeas court. Palmieri's performance was not deficient for having chosen the strategy that he did.

II

The petitioner further claims that the habeas court erred by holding that the petitioner's initial habeas counsel did not provide ineffective assistance of coun-

sel by failing to raise the claim that Palmieri mischaracterized testimony of the allegations and elicited additional damaging testimony during his cross-examination of A. Specifically, the petitioner argues that Palmieri brought out that A's abuse began in the fourth grade, rather than the fifth, as she had initially testified on direct examination; that Palmieri elicited that A's abuse occurred with a certain frequency, after she initially had not testified to any frequency; that Palmieri elicited that the petitioner requested and/or performed additional types of sexual abuse on A and C; and finally, that Palmieri sought to elicit that A disclosed abuse to both H and K, after she had initially testified to having disclosed to K only. We disagree.

The following facts, as found by the habeas court, and procedural history are relevant to this claim. In the petitioner's second criminal trial, A testified on direct examination that the petitioner began sexually abusing her when she was in the fourth grade. She then testified that he started to have penile/vaginal sex with her when she was in the fifth grade. Later on during direct examination, A testified that she had oral sex with the petitioner, but described vaginal sex when she did so. Later still on direct examination, however, she testified that the petitioner put his penis in her mouth once.

On cross-examination, Palmieri elicited that K had told Remillard that the petitioner had been having sex with A once per week or once per month since the fifth grade. Palmieri also asked A if she had told someone at the clinic that she did not have oral sex with the petitioner, to which A answered that she could not recall. Palmieri also brought out the fact that A had previously claimed that the petitioner had put his penis on her buttocks, which A denied was untrue despite not having repeated the claim on direct examination.

Palmieri revisited these subjects during cross-examination of Murphy and Leventhal. During cross-examination of Murphy, Palmieri elicited testimony from Murphy that A had told Murphy that the petitioner wanted A to perform oral sex on him, but that it never happened. Palmieri also brought out that A told Murphy that she had sex with the petitioner "once a month or once a week, like 20 or 10 times." He also brought out that A told Murphy that the petitioner had performed anal sex on A thirteen days prior to Murphy's physical examination of her, but that this examination found no physical evidence of this. During Palmieri's cross-examination of Leventhal, Palmieri tried to establish that if the petitioner had been having vaginal intercourse with A once per week over a three year period, A's hymen would be much more damaged than what was revealed during her physical examination.

During closing arguments, Palmieri highlighted the inconsistencies in A's testimony regarding how frequently she claimed to have been abused. Palmieri

argued that at the extreme, A's testimony could be understood to mean that the petitioner had sex with her once per week over three years—or 150 times. The habeas court found that Palmieri "probably misstated the evidence" by suggesting that the sexual intercourse started in the fourth, rather than the fifth grade, such that the number of occurrences would have been closer to 100 than 150.

As to C, the habeas court found that during her direct examination, she testified that, on multiple occasions, the petitioner had put his hand down her shirt or pants and touched her, and that when she tried to stop him, he pulled her back on his bed by her hair. On cross-examination, Palmieri elicited that more than once after A's disclosure, C had denied having been abused. He also got her to admit that the petitioner had never inserted his finger into her vagina. Palmieri then got her to admit that she had told Brinkman that the petitioner had put his penis on her vagina. On cross-examination of Natale about C's disclosure, Palmieri brought out that C told Natale that any contact with the petitioner occurred on the outside of her clothing.

The standard of review and law regarding ineffective assistance of counsel are set forth previously in this opinion.

The elicitations by Palmieri with which the petitioner takes issue do not constitute deficient performance, and, accordingly, Visone's failure to raise them in the petitioner's initial habeas action also was not deficient. Palmieri's strategy, devised after noting the various changes in the victims' accounts of what had transpired, was to impeach the victims' testimony through prior inconsistencies or denials. His questions, which highlighted discrepancies in the details of the acts of which they accused the petitioner, or outright denials thereof, furthered this strategy. Asking these questions was, therefore, precisely the type of strategic choice that *Strickland* deemed "virtually unchallengeable." *Strickland* v. *Washington*, supra, 466 U.S. 690.

As to Palmieri's misstatement of the evidence of how many acts of sexual intercourse A experienced, the error was not a significant one, and indeed, Palmieri had legitimate reasons, which were consistent with his strategy of impeachment, for focusing on the large number of alleged acts. He used the number to contrast A's claims of once-weekly abuse over an extended period to Remillard and Murphy with her statement to Murphy that she had sex with the petitioner 10 or 20 times. Palmieri also used this contrast to undermine the credibility of Murphy and Leventhal's medical findings. Again, dwelling on this number was a strategic decision, and Palmieri's performance did not fall below an objective standard of reasonableness. See *Strickland* v. *Washington*, supra, 466 U.S. 688.

## III

The petitioner also claims that the habeas court erred by overruling the petitioner's objection to Gambardella's testimony about statements made to him by A, who did not testify. Specifically, the petitioner argues that the statements were hearsay and, as the habeas court had acknowledged, were not within any exception, and that even if they were not barred by the rule against hearsay, they were nonetheless inadmissible because they were not relevant to rebut the petitioner's theory of defense at the habeas trial. The respondent does not challenge either of these arguments directly, but instead counters that the petitioner opened the door to the challenged testimony, or that the statements were harmless because they were cumulative of other testimony. Although we agree with the petitioner that the testimony was hearsay not within an exception, we agree with the respondent that admitting the testimony was harmless error.[4]

The following procedural history is relevant to this claim. During the habeas trial, the petitioner called Gambardella to testify. On cross-examination, the attorney for the respondent asked, "[I]t's true that [A] in fact claimed that her father was having sex with her, right?" to which Gambardella responded "Correct." At this point, the petitioner's counsel objected on the grounds of hearsay. After some argument, during which the court acknowledged that the testimony was not admissible under any of the hearsay exceptions discussed, the court nonetheless admitted it into evidence.[5]

"To the extent a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no 'judgment call' by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citations omitted.) *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007).

"An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Internal quotation marks omitted.) Id., 223; see Conn. Code Evid. § 8-1 (3) (hearsay is "a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish

the truth of the matter asserted"); Conn. Code Evid. § 8-2 (such statements inadmissible unless within recognized exception).

The admitted testimony was hearsay because it consisted of out-of-court statements made by A to Gambardella, which were offered by the respondent to establish the truth of the matter asserted therein. See *State* v. *Saucier*, supra, 283 Conn. 223. Gambardella's testimony recited statements A made to him during an interview conducted before the habeas trial. The attorney for the respondent argued, albeit indirectly, that the statements were offered to prove that Palmieri's performance was not constitutionally deficient, or, alternatively, that because Gambardella's testimony also contained statements that would have incriminated the petitioner, Palmieri's failure to pursue a suggestive interview defense through him did not prejudice the petitioner.[6]

Furthermore, the testimony did not fall within the exception for prior consistent statements, nor the exception for constancy of accusation evidence. See *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996). Nor did it fall within any other recognized exception. It was, therefore, not admissible, and the trial court abused its discretion in admitting it.

The admission of the testimony was, however, harmless error. "When reviewing claims of error, we examine first whether the trial court abused its discretion, and, if so, we next inquire whether the error was harmless. . . . When an error is not of constitutional magnitude, the defendant bears the burden of demonstrating that the error was harmful. . . . The proper standard for review of a defendant's claim of harm is whether the . . . verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 552–53, 34 A.3d 370 (2012). In this case, the petitioner cannot carry this burden. The habeas court reviewed several days' worth of testimony from numerous witnesses, as well as a number of exhibits, including the transcripts from the petitioner's two criminal trials. The improperly admitted testimony was cumulative of this evidence, some of which contained testimony and other evidence of the petitioner's acts of abuse apart from her bare statement to Gambardella. The facts in issue, furthermore, were the constitutional adequacy of Palmieri's legal representation, and, if that representation were found to be deficient, whether that deficiency prejudiced the petitioner. The voluminous record of the proceedings below gives this court "fair assurance that the error did not substantially affect"; (internal quotation marks omitted) id., 553; the habeas court's findings and conclusion.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the petitioner's full name or to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[1] The court granted the petitioner's petition for certification to appeal. See General Statutes § 52-470 (g).

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[3] The petitioner was never charged with any wrongdoing to A's third sister.

[4] In light of our conclusion that the admission of Gambardella's testimony was harmless error, we need not and do not consider the petitioner's additional contention that the testimony was irrelevant, or the respondent's related claim that the petitioner opened the door to its admission. Furthermore, the record reveals that the sole basis for the petitioner's objection at trial was hearsay. The petitioner did not object on the basis of relevance and, accordingly, that claim is not preserved for our review. See Practice Book § 60-5 (court not bound to consider claim unless "distinctly raised"); *Council* v. *Commissioner of Correction*, 286 Conn. 477, 498, 944 A.2d 340 (2008) ("It is well established that [a] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." [Internal quotation marks omitted.])

[5] The court's ruling was as follows: "Yeah, well the question is whether you could have actually gotten this in at trial. But for the purposes of this trial though without knowing exactly where the—the petitioner's claim is going on this, it may be relevant to the prejudice issue and for that reason, I'm going to overrule the objection.

"The witness can testify to it and I'll consider . . . whether it relates to undermining the claim of prejudice because I think that's the only possible thing it could be relevant to and then—and even then I'm still not convinced that it would have come in. But for the purposes of this hearing, I'll—I'll allow it."

[6] The attorney for the respondent stated: "[To] allow the [petitioner] to present [a] witness and then prevent the state from bringing out the harmful testimony that that witness had to offer, especially when [the petitioner is] challenging [Palmieri's] representation for not putting forth that evidence," whereupon the court interrupted him with its ruling. See footnote 5 of this opinion.